[Crim. No. 7057. Second Dist., Div. Two. Apr. 14, 1961.]

THE PEOPLE, Respondent, v. VICTOR FRANCIS BUONO et al., Appellants.

Thomas Whelan, Lawrence William Steinberg, Ellery E. Cuff, Public Defender, Wilbur F. Littlefield and Richard W. Erskine, Deputy Public Defenders, for Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney, and William H. Low, Deputy District Attorney, for Respondent.

ASHBURN, J.—Buono, Murray, Robearge and Thwaits were convicted by a jury in Los Angeles County of conspiracy to commit robbery and of murder; both crimes were fixed as first degree. Defendants were sentenced to life imprisonment for the murder and the term prescribed by law for the conspiracy, sentences to run concurrently. The killing was committed in an attempt to commit a robbery and hence automatically became murder of the first degree. (Pen. Code, § 189.) All defendants appealed. Thwaits' appeal was dismissed pursuant to rule 17(a) and the other appeals are now before us upon a single record. Charged also with former felony convictions, Buono admitted four such convictions, Murray two, Thwaits three, and Robearge three.

The conspiracy had as its objective the robbery of Antonio Mirabile, who lived and was killed in San Diego. The homicide was not part of the plan but was incident to a fight that took place during the attempt to rob the victim. The backbone of the prosecution's case was the testimony of Jeanne Horton, who was one of the conspirators but was not indicted as such, having pleaded guilty to an assault with a deadly weapon made upon Mirabile's nephew, Fillipo Acquaro, who resided with him.

Appellants raise in most instances the same claims of error. The first is want of jurisdiction in the Los Angeles court, the argument being that the conspiracy, if one, was formed and the attempted robbery and murder perpetrated in San Diego County. They also assert error in the court's exclusion of proffered evidence concerning the Sicilian organization known as the Mafia, offered by way of suggestion that the Mafia, rather than defendants, caused Mirabile's death. Much is made of rulings which excluded attempted proof of use of narcotics by Jeanne Horton, the state's principal witness. No claim of insufficiency of evidence is asserted except as it is claimed that the testimony of Horton is inherently improbable and that she, an accomplice, is not adequately corroborated as to the connection of the respective appellants with the commission of the crime.

Arguments concerning overt acts and corroboration of the Horton testimony will be considered first. If there was no

overt act in Los Angeles County the court had no jurisdiction to try the defendants for conspiracy; if there was no competently established conspiracy there was no jurisdiction to try appellants in Los Angeles County for the murder which occurred in San Diego County. If Horton was not sufficiently corroborated as to the connection of any of the defendants with the crime of conspiracy, the evidence would not support a conviction as to that defendant.

As developed principally by the testimony of Horton the facts appear to be as follows, assuming, as we must, verity in the evidence favorable to respondent.

The murder occurred about 1 o'clock on the morning of December 27, 1958. Jeanne Horton resided at the Dawn Hotel in Santa Monica, Thwaits in Torrance, Robearge in Manhattan Beach, all of which cities are in Los Angeles County. Buono and Murray lived at Perris in Riverside County. Mirabile and Acquaro occupied an apartment on the third floor of the Palomar Apartments at Sixth and Maple Streets in San Diego. Horton was on parole after conviction of a felony; she admitted convictions of burglary and possession of narcotics. Her husband recently had been released from State Prison. Some time in November 1958, Thwaits came to her apartment with a friend of hers and said he knew her husband. Later he took her to his house in Torrance and on one occasion he and "Liz" (Elizabeth Kelly) took her to dinner. On one of these visits Thwaits spoke about their being "broke" and said something was coming up later and if she was interested he would let her know about it. She acquiesced, though he did not then explain further. On December 26, 1958, he telephoned her saying the matter had come up and he would be by and pick her up; also that he did not care to discuss it on the telephone but it was very good and he would explain on his arrival. Horton said all right. Thwaits told her to dress as she had to go through the lobby of an apartment. He arrived about 4 p. m. finding her ready and told her they should be back the same night but possibly not; that he did not have time to explain but would do so in the car. In the vehicle was defendant Robearge, commonly known as Sonny. Thwaits made a telephone call and said they were going to San Diego; that they would go there to an apartment and Sonny would go with her. She asked for details and was told that Thwaits could not give them until he met the other people in San Diego. Who are they? That doesn't concern you, we just want you to get into the apartment. They then went

to Robearge's house. He came out with a long butcher knife and a roll of tape. Asked why a knife he said "the mark is an old dago" and guns would not scare him. Next they went to Thwaits' house in Torrance. Liz was there at the time. The three left about 6 p. m. in Thwaits' two-tone green Dodge sedan, Thwaits driving. On the trip, immediately after starting, Horton asked what was going to happen and how much was involved; the men did not want to tell her, saying it was so much she would not believe it, anywhere from $50,000 to $150,000; that it would be a simple matter like taking candy from a baby. The split of the money was brought up and Thwaits said the other two men were to get 20 per cent. Horton was surprised because she thought the going rate was 10 per cent to "finger men." She said that was too high, but Thwaits replied no, there are two of them and their information is reliable, coming from the victim's ex-bodyguard. Robearge asked about a gun and Thwaits said they would get it down south. Horton asked, "Why right now?" and was told the man they "were supposed to take" was leaving for Italy within a week; they would have all the details when they got to San Diego and met some other people. The fact that a crime was to be committed was first mentioned in the car in Santa Monica. Thwaits there said that Robearge would go in with Horton on the job; that they would be the ones that did it. Horton testified she did not recall whether robbery was directly mentioned but she assumed that was what it would be; she knew it was robbery or burglary or something and assumed it was robbery; that it would almost have to be that.

Upon arrival in San Diego Thwaits parked his car back of the San Diego Hotel; soon he said he must have missed the people he was supposed to meet. Then he said, "here he is now." At Thwaits' suggestion Horton and Robearge went to a coffee shop and waited while he talked to the newly arrived men. In due course Thwaits told them (Horton and Robearge) his car was to follow "these people" up to a man's apartment. In that car were Buono and Murray who had driven from Perris to the meeting place, with Buono doing the driving. The two cars moved to a point near the apartment house, parked on the other side of the street next to a public park, about 30 feet apart with the Buono car in front. Murray walked back to the Thwaits car, gave the occupants the layout of Mirabile's apartment, told them where the money would be, said that Mirabile had two wallets, one of which contained

"heavy money" and probably on his person; also told about a wall safe which, if still there, was behind a picture. Horton asked how she would get Mirabile to let her in; Murray said he would get the telephone number for her. He went to the Buono car and returned with a number. Who shall I say told me to call? Murray said he would find out. He returned to the Buono car in which Buono was sitting alone. He had been a San Diego policeman and at another time bodyguard for Mirabile. When Murray was there the second time Buono opened the car door, the light came on, he faced Horton and the others and looked at them. This is the only time that Horton saw him. After talking to Buono, Murray returned and said that Horton should mention Wilbur Clark of Las Vegas to Mirabile. Thwaits asked about a gun and Murray said he had it. He asked about the knife and Robearge said they had it. Horton later identified both Murray and Buono. After going over the apartment layout again, Murray returned to the Buono car which soon left and was not seen again by Horton. She and her companions then killed time until midnight. During this period they discussed just how they would go in; Robearge would go up with Horton posing as a friend that was going to drop her off and that she would get him in and he would tell Mirabile they were after the money after they were upstairs in the apartment. They also purchased some clear nail polish to put on their hands to prevent finger prints. Shortly after 12 o'clock Horton called Mirabile on the telephone and he agreed to receive her and to open the front door of the building for that purpose. When she arrived he did not answer her summons so she called again in a few minutes. He said he would be right down and let her in. When they got out of the car Robearge handed her the knife which she concealed beneath her full coat. Mirabile met her and Robearge and invited them into the apartment. There was some small talk, she went to the bathroom and then Robearge went. Upon Robearge's return he produced a gun, one which belonged to Buono, and said, "This is it, don't get excited, all we want is some money." Mirabile started screaming, "What is happening, you can't get away with this, and there is somebody else sleeping in the apartment." He screamed for Fillipo, the nephew. Robearge said to Horton, "Well, let me go check on this guy and keep him here." She had the knife in her hand; she told Mirabile to sit and he would not get hurt, as all they wanted was the money. He pushed her away and ran toward the back of the apartment. Horton screamed for

Robearge and went to him where he was threatening Acquaro in one bedroom. Robearge said, "I will go see about him [Mirabile], you keep him here," referring to the nephew. Horton told Acquaro to stay where he was, he might get hurt. Acquaro came toward her and as he did so lifted the corner of the mattress and she ducked; he came out and grabbed her, struggling for the knife. While this was going on Horton heard several shots. By that time she was on the floor, Acquaro on top of her, in possession of the knife and trying to stab her. He did succeed. Mirabile came by saying, "they would kill me." Then Robearge arrived, hit Acquaro with the gun and knocked him off of Horton. Mirabile had fled into a bathroom in which he was later found dead. Both doors were locked from the inside, obviously done by himself. After disposing of Acquaro, Robearge said, "We have got to get out of here," and he and Horton fled. Buono's gun was left on the table in the apartment. On the stairs Horton fell and said, "I don't know if I can make it," but with her companion's help she got into the waiting Thwaits car which drove hurriedly away, disregarding a stop sign at the corner.

Acquaro's version of the events in the apartment was slightly different from Horton's. Asleep in his bedroom he became conscious of a noise, saw the clock was at 12 or close to it. The door opened and a man whom he was unable to identify pointed a gun at him and gave him a signal to get out. Acquaro heard Mirabile call for him; he then came by and struck the wrist or arm of the gunman and ran to his own bedroom with the other man in pursuit. The woman came at Acquaro with a long knife brandishing it back and forth in both hands. Acquaro tried to block her with the mattress. While struggling with her he heard four shots in rapid succession and then heard Mirabile cry, "kill her." He was running toward the bathroom screaming "they have killed me." Acquaro managed to get the knife and to stab Horton. She screamed and the man came behind Acquaro and hit him four times on the back of the head with the gun. He got up and hit the man four or five times and became unconscious from loss of blood. Mirabile was calling in Sicilian dialect, "have they gone?" He was in the bathroom with the doors locked. After going for help Acquaro saw the gun on the table in the living room. He tried to open the bathroom door, using among other things the woman's knife which he had found on the floor. He then brought the police who opened the door and found Mirabile dead.

At that time Horton had blond hair. As she and Robearge made their escape several neighbors were gathered in the hallway. She answered their inquiries by saying that nothing was wrong and for them to go back to bed.

Mrs. Hannah Johnson, living on the second floor, had heard a disturbance in the Mirabile apartment, and sounds of scuffling and a woman screaming. She was in the hallway as a blond woman, identified by her as Horton, and a man came downstairs. He had black hair combed straight back from his forehead, was clean shaven and dressed in a dark colored suit. She could not identify him positively, but testified that his appearance was similar to that of Robearge who was in the court room. The woman fell and said, "we will never make it," but Mrs. Johnson saw them no more.

T. J. Flaherty, who lived on the second floor, was awakened about 1 a. m. He heard people running in the Mirabile apartment, heard Mirabile scream and there were sounds of wrestling on the floor. He also heard two shots. Looking out the window he saw a "hard top, two-door, two-toned car" at the curb with lights on. As people entering it closed the door the driver left at a rapid rate. Later police placed at the curb a car of the same make and color as Thwaits'. Flaherty looking out the window pronounced it identical with the one he had seen on December 27th.

Lawrence Conant was reading in his second floor apartment at 12:30 or 1 a. m. on the 27th. He heard scuffling sounds from the third floor and two sharp reports. Through the window he saw a blond girl and a man run from the building entrance to a car parked at the curb. The man had dark hair brushed back. The car departed at once. Later police asked him to look at one they had parked below. He pronounced it of the same general type and exactly the same color as the one seen by him on the 27th.

Elizabeth Bischoff, living on the fourth floor, was awakened at 1 a. m. on December 27th by a woman screaming and a shattering of glass. Through the window she saw legs disappearing into a car at the curb. It left in a hurry, not stopping at the boulevard sign on the corner. Her description of the car tallied with that of Thwaits' two-toned Dodge. The police found human blood on the right side of the front seat of Thwaits' car. Horton rode in that spot on the return trip from San Diego.

 The foregoing résumé of evidence favorable to respondent's case leaves no room for doubt that a conspiracy

was formed as charged. Where or when this was done does not clearly appear but the concert of action between the Los Angeles participants and those from Perris pursuant to a previously arranged schedule, the inquiry from the one group about the gun and from the other group as to the knife, the exchanging of information concerning the layout of the Mirabile apartment and the proper method of gaining entrance, leave no room for doubt that all had been done pursuant to a previous arrangement looking to the robbery of Mirabile.

The fact that Horton, and perhaps her companions, did not know before reaching San Diego County the details of the conspiracy they had joined, does not detract from the fact of conspiracy (otherwise proved) or from her or their voluntary participation in it without complete knowledge of its objective or details. ''Common design is the essence of a conspiracy and the crime can be committed whether the parties comprehend its entire scope, whether they act in separate groups or together, by the same or different means known or unknown to them, if their actions are consistently leading to the same unlawful result. . . . Any joint action on a material point or collocation of independent but conspiring acts by persons closely associated with each other, is held to be sufficient to enable the jury to infer concurrence of sentiment; and one competent witness will suffice to prove cooperation of an individual conspirator.'' (*People* v. *Means*, 179 Cal.App.2d 72, 80-81 [3 Cal.Rptr. 591].) (Accord: *People* v. *Drake*, 151 Cal.App.2d 28, 39 [310 P.2d 997]; *Blumenthal* v. *United States*, 332 U.S. 539, 557 [92 L.Ed. 154, 168, 68 S.Ct. 248]; *Marino* v. *United States* (9th Cir.), 91 F.2d 691, 696 [113 A.L.R. 975]; 15 C.J.S. § 40, p. 1062.)

 On cross-examination Mrs. Horton testified: ''Q. Now, when you first were called and you agreed to go, you knew that you were going in an enterprise that was in violation of the law as well as morally wrong, didn't you? A. Yes. Q. And you were a willing and willful and intentional participant in this plan to break the law, whatever it was? A. Yes.'' This of itself was enough to make her a party to the conspiracy which gradually unfolded before her and to which she testified.

It is important here to keep in mind the familiar rule that the corroboration required by Penal Code, section 1111[1] does

---

[1]Pen. Code § 1111: ''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as

not include the corpus delicti and is confined to the matter of connection of the individual defendant with the crime. ██ "The only corroboration necessary for the evidence of an accomplice under the statute is that which tends to connect the defendant with the commission of the crime, not evidence of the corpus delicti. [Citations.] ██ The corroborative evidence may be slight and entitled to little consideration when standing alone. [Citation.] Defendant's own admissions are sufficient corroboration. [Citation.] Finally, corroborative evidence may be circumstantial. [Citation.]" (*People* v. *Wade,* 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116].) These rules are applicable to conspiracy as well as any other crime. It is a distinct crime in itself (*People* v. *Robinson,* 43 Cal.2d 132, 138 [271 P.2d 865]), defined by section 182, Penal Code.

██ The testimony of an accomplice is sufficient to establish the fact of conspiracy; he or she needs corroboration only with respect to defendant's connection with it. ██ "There is a distinction between the declarations of an accomplice made during the course of a conspiracy and the testimony of a conspirator given at a trial and while under oath and subject to cross-examination. Standing alone, such testimony is ordinarily sufficient to prove the corpus delicti of an offense, leaving to the corroboration by other evidence the proof of the criminal agency, or such evidence as tends to connect the defendant with the commission of the offense." (*People* v. *Griffin,* 98 Cal.App.2d 1, 46 [219 P.2d 519].) See also *People* v. *Teitelbaum,* 163 Cal.App.2d 184, 214 [329 P.2d 157]; *People* v. *McNamara,* 103 Cal.App.2d 729, 739-740 [230 P.2d 411]; *People* v. *Goldaber,* 17 Cal.App.2d 195, 197 [61 P.2d 975].

██ The testimony of Horton, which obviously was credited by the jury and trial judge, is sufficient in itself to establish the fact of the conspiracy, thus requiring corroboration of her accomplice testimony only as to the connection of the defendant with that existing conspiracy. Appellants' claim that her evidence was inherently improbable is without merit. ██ "To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or de-

shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ."

ductions." (*People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758].) To same effect see *People* v. *Wein,* 50 Cal.2d 383, 399 [326 P.2d 457].

 In discussing the sufficiency of the corroboration we therefore assume as an established fact the conspiracy shown by the Horton testimony, bearing in mind the rule that "Section 1111 of the Penal Code does not require that an accomplice be corroborated as to every fact to which he testified but only that the corroborative evidence tend to connect defendant with the commission of the crime in such a way as reasonably may satisfy a jury that the accomplice is telling the truth." (*People* v. *Simpson,* 43 Cal.2d 553, 563 [275 P.2d 31].)

As will become apparent the corroboration in this case does not require aid from the testimony of the accomplice Horton in order to connect the defendant with the commission of the offense charged. In *People* v. *Goldstein,* 136 Cal. App.2d 778, 788 [289 P.2d 581], the court quoted from *People* v. *MacEwing,* 45 Cal.2d 218, 224 [288 P.2d 257], as follows: " 'The corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth.' " Page 225 : " 'The decisions applying section 1111, relating to accomplices, hold that the corroborative evidence required by that provision must be considered without the aid of the testimony which is to be corroborated and that it is not sufficient if it requires the interpretation and direction of such testimony in order to give it value. . . . In our opinion both statutes must be construed to mean that corroboration is not adequate if it requires aid from the testimony of the person to be corroborated in order to connect the defendant with the commission of the offense charged.' " Then the Goldstein opinion adds: "But this does not require the corroboration to do more than substantially tend to connect the defendant with the commission of the offense in such manner as to satisfy the jury that the accomplice is telling the truth. It does not require the testimony of the accomplice as to the corpus delicti, e.g. existence of the conspiracy, to be corroborated." (P. 788.)

*People* v. *Henderson,* 34 Cal.2d 340, 346 [209 P.2d 785], says: "When as in the present record it is discovered that there is testimony aside from that of the accomplice which tends to connect the defendant with the commission of the crime, the function of the appellate court is performed."

218

Fricke on California Criminal Law (7th Ed.), page 108: "Since the accomplice need be corroborated only as to that portion of his testimony which tends to connect the defendant with the offense charged, the suggestion in the Morton case [139 Cal. 719, 724 (73 P. 609)] is too broad since, if the entire testimony of the accomplice were eliminated from consideration, we would exclude testimony of the accomplice as to matters as to which he need not be corroborated such as the sole proof of the corpus delicti. The true rule is whether there is any evidence, other than the testimony of the accomplice which tends to connect the defendant with the commission of the offense and, if there is, the accomplice is corroborated and, if there is no such evidence, then there is no such corroboration as is required by law."

▉▉▉ As to Robearge. The identification by Mrs. Hannah Johnson, though not positive, established a similarity of appearance of defendant Robearge and the fleeing robber-murderer. That is enough for valid legal identification (see *People* v. *Jackson*, 183 Cal.App.2d 562, 568 [6 Cal.Rptr. 884]).

On December 26-27 Robearge did not have a mustache. Such was the testimony of Acquaro, Mrs. Johnson, Mr. Fielder (Personnel Manager of the company where Robearge worked), and William Bryden (his welding foreman). Bryden said that Robearge began wearing a mustache two or three weeks after Christmas, 1958. Mr. H. Wright, appellant's next door neighbor, testified that he saw him about 10 a. m. on December 26th and that he had no mustache; also that Robearge had one for some weeks in the previous September, at which time he told Wright that a mustache was "an important change in his face and would make it difficult positively to identify him." Appellant appeared at the trial wearing a mustache. He told Lieutenant Geer that he had one prior to Christmas. These manifestations of consciousness of guilt and effort to cover up certainly constitute the required corroboration.

So do defendant's efforts to conceal his absence from home and from work on December 26th. He told Lieutenant Geer that he had worked on that day and went into detail as to vividness of memory in that respect, adding that he reported sick the following morning due to a hangover. Confronted with the fact that the 27th was Saturday and not a work day, he referred to his wife as having a better memory than his own. The Personnel Manager and the welding foreman of his employer testified that he did not work on the 26th. Daryl

Gray went to Robearge's residence at 7:30 p. m. on the 26th and he was not there. At 1 a. m. on the following morning Gray took Mrs. Robearge home and defendant was not there at that time.

Elizabeth Kelly, who was living at the Thwaits' house, testified that Thwaits brought Robearge and Horton to the house at about 6 p. m. on the 26th; that they left about 7 p. m. and that Thwaits said he was going to San Diego. He also told Mrs. Kelly if Robearge's wife phoned she should not tell her where they were going.

Robearge's knife was found on the floor of Mirabile's apartment after the murderers had fled.

Much other corroboration is found in the record but the foregoing is amply sufficient to corroborate the Horton testimony as to Robearge's connection with the crime.

As to Murray. On December 27th he told Deputy Sheriff Capps he was last in San Diego several weeks or months previously, later admitting he was there on the 26th. According to the testimony of Mrs. Alice Murphy he saw her in San Diego on the evening of the 26th and told her Buono was not in town with him. The telephone company records show numerous telephone calls between Thwaits and Murray on the 26th,—one at 11:35 a. m. immediately after Thwaits' call to Horton at 11:30; at 1:50 another telephone call from Murray to Thwaits' residence. On the 27th there was a call between Thwaits and Murray at 5:19 a. m. and another at 11:39 a. m. Murray admitted making three telephone calls to his home between 6 and 8 p. m. on the 26th. He told police he was concerned about his son who was expected to return from San Diego to Perris that night; but the son testified he had not planned to return that night and had not told his father he would.

Murray told Officer Myers that he and Buono drove to San Diego on the 26th to see one Burnett, and left for home at 8 p.m., so he admittedly was there about the time Horton said he was. Murray also told the officer he had seen Mirabile in San Diego at crime hearings in late 1958, and that Buono pointed him out and said he had tried to borrow money from Mirabile. Asked about his and Buono's leading the way to the Mirabile apartment for the other three confederates, Murray said, "I would rather not answer that." Asked if it wasn't true that while at that location he talked to the other three persons, he answered, "I would rather not answer that." Myers said, "You don't deny that you talked to Hank

[Thwaits] on Sixth Street?'' and Murray replied, ''no.'' Later he denied talking to Hank on Sixth Street. He admitted to Myers that only two persons could have removed the Buono gun from Murray's house, declared he had not done it, but when asked if Buono had removed it he said, ''I would rather not say.'' When asked if he knew who gave the gun to another party he stated he would rather not say. Shown a picture of Robearge and asked to identify it, Murray replied, ''If this is the person that I think you are referring to, I only saw one time, I think it is the person, but it is not a good picture.'' Shown a picture of Horton, he gave the same reply. He also said ''he had only seen the two persons he thought we were referring to for a short time in a darkened area.'' He asked if he could make a proposition to the officers, saying that he wanted to talk to his wife and then ''he would tell us all he knew about this.'' Also that he felt if he told them the truth they would believe him and that if he told them what he knew about it they would be surprised at some of the details. To the suggestion that Buono had been using him and remaining in the background, Murray laughed and said that as serious as the charges were he could still laugh as he could see exactly how he had been used. The officers were unable to contact Murray's wife and gave him ''a couple of hours to think it over.'' Later when they saw him he said he had talked to an attorney in jail and would not discuss the case until he had further talked with the attorney. The corroboration is ample as to Murray.

▮▮▮▮ Concerning Buono. The gun which was found in Mirabile's apartment with three shots fired belonged to Buono. He testified that he had purchased it from C. H. Hillary in 1955; that he took it to Murray's home and left it about Thanksgiving of 1958, because his own son had been playing with it; that he did not see it later. He admitted that he and Murray did drive to San Diego on December 26th. As this same gun was found in Mirabile's apartment after his murder, it must have been taken on this trip and delivered to Robearge before he entered that apartment. Buono admitted on the witness stand that he talked to Mirabile at the crime hearings in San Diego and tried to get him to pay off a $5,000 obligation of Buono's.

Sergeant Sgobba, of the San Diego Police, saw Buono in Perris driving a car in January, 1959. He got in with him and Buono started to drive off, saying he did not want Murray to see him parked in a car talking to Sgobba. The officer

told him the police were convinced that he alone had the intimate knowledge of Mirabile's habits "to set up the robbery." Buono said, "I just remembered. Murray had the information too," explaining that at the crime hearings in San Diego the Murrays were close by when Mirabile wanted to pay his attorney and told him, "I have got $10,000 in my pocket right now."

Next day after an interview with Sergeant Orr, Buono asked for him and said he was in a jam and needed help. Told that the district attorney was the only person who could help him he asked Orr to see that official in his behalf. Orr asked what Buono had to offer and he said he had been "double crossed by this whole outfit"; that he had planned a robbery of a Chinaman in San Diego named Charlie Lei, a revenge robbery. He related that when he and Murray were in San Diego in front of the Hotel San Diego Murray said "stop the car"; he did so and Murray got out and met another man who was near the San Diego Hotel. Murray came back and instructed Buono to drive around the block and park on State Street; Murray and the other man had a discussion and then Murray came back to the car and said, "he is going after them now." Shortly after that this same man came back to the car with a blond woman and a slender man. Buono said he could not identify any of them but "You can tell in a minute whether you have got the right girl or not, she will have a stab wound in her chest." He also said that the three people got into one car and he and Murray into Murray's car and both drove to within a block of the Mirabile apartment; that Murray then left the car, had a discussion with the other three in the other car; returned and told him, Buono, "Everything is all set, she's got a stiletto about this long," indicating 18 or 20 inches. He and Murray returned to Perris after the latter made a telephone call. Buono accurately described Thwaits' 1956 Dodge car. He also said that on the following morning about 11 o'clock Murray came to his house and told him that Mirabile was dead and the police were swarming around his apartment. They drove to South Riverside where Murray made a telephone call and upon returning said "that the girl had been stabbed, possibly fatally." Later, Sergeant Orr told Buono that the district attorney was not interested in any deal. About that time Robearge passed a nearby window and Buono was asked to look at him. After doing so he did not say anything but nodded in the affirmative and then said, "How could

a person miss a schnozz like that?" Buono then asked again to talk with the district attorney and said, "I can possibly give you an eyewitness to people being here, plus the fact that this box of .38 shells that Mr. Murray had in his car." Also Buono told him that they had to get rid of those shells because of the possibility of comparison, and they drove out toward Hemet and Murray dumped the shells alongside the road. There is no insufficiency of corroboration here.

The same evidence which connects each of the appellants with the conspiracy and its attempted robbery connects them with the murder. (25 Cal.Jur.2d § 84, p. 590.) The murder needs no further or other corroboration. People v. Martin, 12 Cal.2d 466, 472 [85 P.2d 880] : "It is, of course, the well-settled law in California that if a human being is killed by any one of several persons jointly engaged at the time of such killing in the perpetration of or an attempt to perpetrate the crime of robbery, whether such killing is intentional or unintentional, or accidental, each and all of such persons so jointly engaged in the perpetration of, or attempt to perpetrate such crime of robbery, are guilty of murder of the first degree." People v. Waller, 14 Cal.2d 693, 703 [96 P.2d 344] : "It is well established, however, that if a homicide is committed by one of several confederates while engaged in perpetrating the crime of robbery in furtherance of a common purpose, the person or persons engaged with him in the perpetration of the robbery but who did not actually do the killing, are as accountable to the law as though their own hands had intentionally fired the fatal shot or given the fatal blow, and such killing is murder of the first degree. The jury has no option but to return a verdict of murder of the first degree whether the killing was intentionally or accidentally done, and it is proper so to instruct the jury." To same effect see People v. Miller, 37 Cal.2d 801, 805 [236 P.2d 137]. Proof of defendant's connection with the conspiracy to rob connects him as a matter of law with the attempt to rob and the ensuing murder.

The fact of a conspiracy to rob and commission of numerous overt acts having been competently established, the question of jurisdiction of the Superior Court of Los Angeles County next arises. This turns upon the question of whether one or more overt acts were committed in that county regardless of where the conspiracy was formed. A single overt act is enough. (People v. Garrison, 80 Cal.App.2d 458, 463 [181 P.2d 738].)

Section 184, Penal Code, says: "No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act be done." Section 182: "... All cases of conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done." Section 781: "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory." The overt act need not be criminal in itself (*People* v. *Robinson,* 43 Cal.2d 132, 139 [271 P.2d 865]), and may be merely a part of preliminary arrangements for commission of the ultimate crime (*People* v. *Abbott,* 47 Cal.2d 362, 370 [303 P.2d 730]; *People* v. *Gerundo,* 112 Cal.App.2d 863, 869 [247 P.2d 398]). It need not be performed by the individual defendant if he is a member of the conspiracy. (11 Cal.Jur.2d § 14, p. 234.)

 Where an overt act is a continuous one, such as driving from Los Angeles to San Diego, it suffices to fix the jurisdiction in either county. (*People* v. *Anderson,* 90 Cal. App.2d 326, 330-331, 334 [202 P.2d 1044]; *People* v. *Rodriguez,* 100 Cal.App.2d 549, 552 [224 P.2d 49]; *People* v. *Ortez,* 120 Cal.App.2d 469, 472 [261 P.2d 325]; *People* v. *Simms,* 144 Cal.App.2d 189, 197 [300 P.2d 898]; *People* v. *Zelver,* 135 Cal.App.2d 226, 235 [287 P.2d 183].) Discussing section 781, Penal Code, the court said in *People* v. *Megladdery,* 40 Cal.App.2d 748, 774 [106 P.2d 84]: "Respondent contends that under section 781 of the Penal Code a particular county cannot have jurisdiction over an offense unless some act which is a necessary element of the offense is committed in that county, or unless some effect of such an act, which effect is an essential or necessary element of such offense, occurs within the county. Respondent also contends that once the commission of an offense has progressed to the point where prosecution therefor is warranted, no act thereafter committed, and no effect of such act thereafter occurring, is or can be an act or effect which is an essential or necessary element of that offense. Neither contention is

sound. The first is refuted by the language of the section. Section 781 of the Penal Code provides:

" 'When a public offense is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county.'

"The interpretation contended for by respondent would completely disregard the phrase 'or the acts or effects thereof constituting or requisite to the consummation of the offense' contained in the section. Obviously, the phrase, 'or requisite to the consummation of the offense', means requisite to the completion of the offense—to the achievement of the unlawful purpose—to the ends of the unlawful enterprise. By the use of the word 'consummation' the legislature drew a distinction between an act or an effect thereof which is essential to the commission of an offense, and an act or effect thereof which, although unessential to the commission of the offense, is requisite to the completion of the offense—that is, to the achievement of the unlawful purpose of the person committing the offense.

"By his second contention respondent would limit the essential or necessary elements of an offense or its effects to those acts or effects of acts occurring prior to the instant that the offense becomes sufficiently complete to warrant prosecution. Under the interpretation we have already given to the section, this construction cannot be sustained." See also *People* v. *Anderson,* 3 Cal.App.2d 521, 523 [40 P.2d 270]; *People* v. *Gonzalez,* 180 Cal.App.2d 285, 288 [4 Cal.Rptr. 822].

 When Thwaits, Robearge and Horton met in Santa Monica and there started their journey to San Diego, an overt act sufficient to sustain Los Angeles jurisdiction was performed. When Thwaits told Horton and Robearge, while still in Los Angeles County, and they agreed that they would be the ones that would do the job, that was another overt act in that county. When Robearge went into his house in Manhattan Beach and brought out the long knife and roll of tape, another Los Angeles overt act occurred. Jurisdiction to try the conspiracy charge plainly was fixed in that county.

 Appellants argue, however, that San Diego had exclusive jurisdiction over the crime of murder, relying upon section 790, Penal Code, which says in part: "The jurisdiction of a criminal action for murder or manslaughter is in the county where the fatal injury was inflicted or in the

county in which the party injured died or in the county in which his body was found. . . .'' Viewed apart from the conspiracy, this section doubtless would be controlling, but *People* v. *Abbott, supra,* 47 Cal.2d 362, teaches otherwise. That case involved a kidnaping which began in Alameda County and apparently resulted in murder in Trinity County where the victim's body was found. Convicted in Alameda County appellant contended: ''[T]hat the judgment should be reversed, claiming that the Superior Court of Alameda County did not have territorial jurisdiction of the offenses of which he was convicted.'' (P. 369.) The court said: ''The jurisdiction of a criminal action for kidnaping is in the county in which the offense was committed or out of which the victim was taken or in which an act was done by the defendant in promoting or aiding in the commission of the offense. (Pen. Code, § 784. For definition of the terms used in § 784 see Pen. Code, § 691.) Stephanie was taken out of Berkeley, which is in Alameda County, and there can be no doubt that the superior court of that county had jurisdiction to try the offense of kidnaping.

''Section 790 of the Penal Code provides that the jurisdiction of a criminal action for murder is in the county where the fatal injury was inflicted or the party died or his body was found. Stephanie's body was not found in Alameda County, and there is no evidence that either fatal injury or death occurred there. We are of the view, however, that section 790 was not intended to exclude the application of other statutory provisions relating to territorial jurisdiction in criminal cases. Section 781 of the Penal Code provides, 'When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory.' Under this section, the county in which preliminary arrangements for the commission of a crime are made is a proper county in which to prosecute the completed offense, although the acts performed there did not constitute an essential element of the crime. [Citations.] We are satisfied that, where, as here, charges of both kidnaping and murder are involved and arise out of acts occurring in more than one county, section 781 is to be read as complementing section 790 so that the court of the county out of

which the victim was taken has jurisdiction of the offense of murder. [Citation.]'' (Pp. 369-370.)

We see no difference in principle between the combination of kidnaping and murder and that of conspiracy to rob with resulting murder, except the emphasis that Penal Code, sections 182, 184 and 781, lend to the propriety of reaching the conclusion announced in Abbott, *supra*. We are satisfied that the Los Angeles County Superior Court had jurisdiction over both charges in this case.

 Appellants complain of exclusion of proffered testimony about the Mafia. That organization was described by defense counsel as the "organization of Sicilian, or Sicilian American groups sometimes in the past known as the Black Hand and often referred to as the Sicilian Brotherhood." The theory as explained by counsel for defendants was that Mirabile was reputed to be San Diego head of the Mafia from 1951 through 1958; that he was discussed at hearings of the State Crime Commission conducted in San Diego County; that he was reputed to have attended a meeting of the Mafia at the Grace Ranch near Tucson in 1954 and that Buono "can prove that as a matter of Mirabile's reputation"; that unfavorable publicity was thus incurred; that "according to Mafia practice that it is probable to believe that because of the undue publicity that Mr. Mirabile had received that he *might have been* dealt with by the Mafia" (emphasis added); that Captain Hamilton of the Los Angeles Police Department testified before the crime commission and was quoted in a San Diego and a Los Angeles newspaper concerning the Mafia and its practices of revenge (these newspapers were offered as evidence); that counsel believed that Captain Hamilton, who was under subpoena, "is in position to testify that there was some association between Tony Mirabile and Jack Dragna who was reputed to be the head of the Mafia on the West Coast prior to his death and who resided here in Los Angeles, and we think that this Fillipo Acquaro, one of the witnesses in this case, was a cadet and being groomed in the Mafia''; "MR. WHELAN: Does your Honor hold that any offer of proof with reference to the membership of Tony Mirabile in the Mafia, or the fact that he visited this Grace Ranch, or that the Mafia itself when they are dissatisfied with a member get rid of the member either by expelling him or by eliminating him by execution, is immaterial here? THE COURT: Under the facts of this case it is." This ruling was followed by additional offers as to what testimony Captain Hamilton gave

before the crime commission. Again, "In this book by Sondern, which has the written approval of and commendation of Harry Anslinger, who is the Federal Commissioner of Narcotics in Washington, in this book they talk about the practices of the Mafia eliminating members when they are displeased with the members and the members don't want to stand being expelled, then they are eliminated, they are murdered, they are executed, and that appears in three or four different places in this book, 'The Brotherhood of Evil: The Mafia,' by Sondern, and it is, I think, recognized by different members in law enforcement as an authentic book and recital of the practices and rules of the Mafia. . . ." Arguing further to the court counsel said: "So that means that there must have been some kind of a struggle in that apartment different than the struggle that Acquaro has told us about and different from the struggle that Horton has told us about, and that could well be explained by a subsequent struggle between Mirabile and this so-called nephew of his, who is not a nephew of his at all, after these other people had gone. *You might think that we are stretching out and reaching for something,* but you have definitely the testimony that there was this dent there in the wall, there was this plaster and paint down on the table, some of it on this gun, and it is unexplained." (Emphasis added.) In arguing to the jury counsel who had made these offers said: "Now, I am not trying to throw any responsibility for the killing of Tony Mirabile on Fillipo Acquaro. That isn't my job. It is the prosecution's job in this case to prove the guilt of the people on trial here beyond a reasonable doubt." Still "stretching out and reaching for something" counsel for Buono argue in this court as follows: "A pretty fair case could have been made out against FELIPE ACQUARO, supposed to have been the nephew of TONY MIRABILE, but who was in fact a distant relative. He had been brought over from Sicily sometime earlier in 1959, but did not move into TONY MIRABILE's apartment until after the expose of TONY MIRABILE as head of the Mafia and the meeting of the State Assembly Rackets Committee. In the light of the practices of the Mafia with reference to members and leaders who bring undue publicity to the organization, as set forth in the book, 'The Brotherhood of Evil, the Mafia,' by Frederick Sander[sic], Jr., which has a foreword and an endorsement by Harry J. Anslinger, Commissioner, Bureau of Narcotics of the Treasury Department, an extensive examination of CAPT. HAMILTON could very well have established that it was

more reasonable and probable that FELIPE ACQUARO was the actual killer of TONY MIRABILE than anyone else.''

It is immediately apparent that the offers of proof consisted of hearsay, conclusions and speculation, but nothing amounting to competent proof of any probability that the Mafia or Acquaro as its agent ever intended, threatened or desired to kill Mirabile. The nearest counsel got to an offer to prove threats against Mirabile was the following: ''Now, if we are allowed to prove all of these things by this witness, we intend to go farther and ask this witness if he didn't know as a fact that Norph Broncato, who has been released from Folsom Penitentiary and was released some time during the latter part of 1958, had made threats concerning Tony Mirabile because of the contention of Norph Broncato, whose brother was killed, that Tony Mirabile had ordered the killing. I don't know whether Captain Hamilton will testify to that latter portion concerning Norph Broncato, but he certainly would testify to all the rest, and all of the things on which it was quoted.''

A defendant may, of course, establish his innocence by proving directly or circumstantially that some other person or persons killed the victim. But the mere possibility that some third person did it is not enough. There must be some competent and substantial proof of a probability that this happened. *People* v. *Mendez,* 193 Cal. 39, 51, 52 [223 P. 65]: '' 'It is always proper to show that some other person and not the defendant committed the crime with which he is charged.' (*People* v. *Mitchell,* 100 Cal. 328, 333 [34 P. 698, 700].) The question herein is what kind and quality of evidence is essential to that end. . . . It seems clear that a defendant, in order to exculpate himself, should not be required to establish the guilt of a third person with that degree of certainty requisite to sustain a conviction of the latter. On the other hand, it seems equally clear that evidence which simply affords a possible ground of possible suspicion against another person should be inadmissible. The decisions in other states are not completely harmonious upon this question. But they are substantially unanimous in holding that mere evidence of motive in another person, or of motive coupled with threats of such other person, is inadmissible unless coupled with other evidence tending to directly connect such other person with the actual commission of the crime charged. . . . It seems to us that there is a sound basis for this rule and that it rests fundamentally upon the same consideration

which led to the early adoption of the elementary rules that evidence to be admissible must be both relevant and material. It rests upon the necessity that trials of cases must be both orderly and expeditious, that they must come to an end, and that it should be a logical end. To this end it is necessary that the scope of inquiry into collateral and unimportant issues must be strictly limited. It is quite apparent that if evidence of motive alone upon the part of other persons were admissible, that in a case involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased; that a great many trial days might be consumed in the pursuit of inquiries which could not be expected to lead to any satisfactory conclusion.'' Accord: *People* v. *Perkins,* 8 Cal.2d 502, 514-515 [66 P.2d 631]; *People* v. *Vatek,* 71 Cal.App. 453, 473 [236 P. 163]; *People* v. *Gentekos,* 118 Cal.App. 177, 182 [4 P.2d 964]; *People* v. *Wagner,* 21 Cal.App.2d 92, 95 [68 P.2d 277]; *People* v. *Landry,* 106 Cal.App.2d 8, 12 [234 P.2d 736]; Fricke on California Criminal Evidence, 5th edition, page 264; 40 Corpus Juris Secundum, sections 219-220, pages 1132-1133.

There was no error in the court's rulings upon the questions and offers of proof having to do with the subject of the Mafia.

Another claim strongly pressed by appellants is error in excluding evidence concerning Jeanne Horton's alleged use of narcotics. On cross-examination she was asked whether she was using any narcotics on December 26, 1958, or at the time of her arrest on February 2, 1959, whether she was using any narcotics at all in December, 1958 or in January and February, 1959; she answered all these questions in the negative. She said she knew Calvin Woods and was asked whether he ever furnished her any narcotics during the period of December 1958 through February 1959, and she said no. By way of attempted impeachment defendants made several offers. One was to prove that at some time shortly before the 6th of January, 1959, Woods saw Horton administer narcotics to herself. One of defense counsel said: ''This is impeachment of the testimony that she was not using narcotics at the time, and this would certainly impeach her as to that, if he testified the way I think he would testify.'' Another defense attorney: ''This isn't being offered for purposes of impeaching the power of this witness to observe

and to recollect, and it is certainly proper''; and ''The witness Horton also denied upon questioning that she had taken narcotics during any of this period, that is, around December 26th, and a few days prior thereto, or a subsequent time up to and including the time of her arrest''; at another time: ''Further, that Jeanne Horton had called him and said she was sick. . . . That she was sick and that in response to a telephone call he went to her apartment and that he brought the narcotics, and that both he and Jeanne Horton fixed in her apartment; that this was a few days before January 6, 1959''; also, ''MR. WHELAN: In addition to impeaching the testimony of Jeanne Horton, I think this is affirmative evidence to show by circumstantial evidence that the jury could well infer that she was on December the 26th and for a long time thereafter addicted to and under the influence of narcotics, and it is a circumstance that I think is admissible, I believe, to establish that, and while the fact that she was under the influence of narcotics wouldn't destroy her testimony, it is something that goes to the weight of her testimony and the jury is entitled to pass on her testimony and determine what weight they ought to give it. . . . MR. LITTLEFIELD: I would like to say, also, your Honor, that we will offer, as Mr. Whelan suggested or stated, evidence not only to impeach the witness, but circumstantial evidence to show her addiction as well as for the purposes of impeachment.''

No expert testimony of any kind was offered in this connection and the effort to discredit or impeach Horton's testimony was not made through further cross-examination. A reading of the cold record discloses no basis for inferring that her mentality had been impaired either as to her ability to observe and remember or to accurately detail the facts. Her credibility was impeached by admission of former convictions of felony and admission of a disposition to lie to the Police when that seemed expedient; but that has no connection with narcotics.

The case of *People* v. *Bell,* 138 Cal.App.2d 7 [291 P.2d 150], seems controlling. It is factually distinguishable, but it decides the cardinal question contrary to the contention of appellants herein. In that case a medical expert was permitted to testify to effects of narcotics addiction other than an effect upon the witness' ability to tell the truth: ''He was allowed to and did testify that a person using heroin to the extent of Miss Strange would, in his opinion, have

recognizable mental and moral deterioration; that her condition would be one of confused dullness. The court consistently refused to permit the witness to answer the question as to whether this addiction would have any effect on the witness' ability to tell the truth. . . . One of the major contentions of appellant is that the trial court committed prejudicial error in limiting Dr. Shaw's testimony, in effect, to his opinion as to what effect addiction would have on memory and perception and ability to narrate, but preventing testimony as to the effect of addiction on veracity.'' (Pp. 10-11.) At pages 11-12, the court further said: ''The cases are divided on the question as to whether such evidence is admissible to impeach the witness' veracity. . . .

''In this state, whatever the rule may be in other states, the problem is partially, at least, covered by statute.

''Section 2051 of the Code of Civil Procedure provides that a witness may be impeached by 'contradictory evidence or by evidence that his general reputation for truth, honesty or integrity is bad,' or by evidence of conviction of a felony. Section 2052 provides that a witness may be impeached by evidence of prior inconsistent statements. The evidence here involved does not, of course, fall into any of the classes there enumerated. The courts have frequently held that this statutory enumeration is exclusive of other methods of impeachment. [Citations.] However, California has recognized that there is at least one exception, and that is that a witness may be impeached on cross-examination, in addition to the enumerated methods, by evidence that he is affected by mental disease or mental derangement that affects his powers of perception, memory or narration. [Citations.] In *People* v. *Dye*, 81 Cal.App.2d 952, at pages 963 [185 P.2d 624], the limitations on this exception are stated as follows: 'As for the mental condition of the witness the court said in *People* v. *Champion*, 193 Cal. 441, 448 [225 P. 278] . . .: ''A witness not affected by mental disease or mental derangement may be impeached only in the manner and for the reasons provided in sections 2051 and 2052 of the Code of Civil Procedure. . . .'' . . . Appellant argues that the jury had a right to consider the mental condition of Hernandez, *which is doubtless true . . . But it does not follow that appellant was entitled to produce a witness to testify as to his opinion that the boy was mentally deficient and emotionally unstable. As said in People v. Champion, supra, this must be developed by cross-examination.'* (Italics added.)

"Thus, even if addiction does cause a general predilection towards untruthfulness (a fact not supported by substantial medical authority—see 16 So. Cal.L.Rev. 333, 334), the witness could be impeached in this respect in this state only on cross-examination, and not by the production of other witnesses, experts or otherwise. It follows that the restrictions placed on the examination of Dr. Shaw by the trial court were proper."

To this we add the further thought that it is the effect of narcotics addiction upon truthfulness of the witness that may be material in a case like this, and not the mere fact of addiction. Addiction per se presents a collateral issue and the matter of impeachment lies within the discretion of the trial court. (Code Civ. Proc., § 1868; see also Witkin on California Evidence, §§ 673-675, pp. 711-713.) Its effect upon capacity or disposition to tell the truth may become material, but appellants at bar made no effort to support a conclusion that there was such addiction as would affect the credibility of the witness, a subject upon which the experts are not agreed, one upon which a jury is not entitled to speculate. (See discussion of *People* v. *Bell, supra,* in Witkin on California Evidence, § 642(2), p. 688.)

An annotation in 52 American Law Reports 2d, at page 849, says: "Although the authorities are somewhat conflicting, the rule supported by the majority of the cases seems to be that for the purpose of discrediting a witness, evidence is not admissible to show that he is a user of opium, morphine, or similar drugs, or to show the effect of the use of such drugs, unless it is proven that the witness was under their influence at the time of the occurrences as to which he testifies, or at the time of the trial, or that his mind or memory or powers of observation were affected by the habit."

16 So.Cal.L.Rev. 333, 334: "However, the not too numerous, and in the main inadequately reasoned, cases upon this subject suggest the following conclusions: (1) The active influence of the drug or the organic impairment of faculties arising out of its habitual use may affect the capacity of the witness to perceive, to remember or to narrate, and may thus be relevant to the issue of his credibility. The issue as to the nature and extent of the impairment is just an ordinary issue of fact. (2) Doubtless a pathological liar would be lacking in credibility as a witness. If the use of narcotics can produce a pathological liar, then such use becomes logically relevant to the issue of credibility. The basic inquiry here

lies in the field of science. This specific problem is little discussed in the cases. Only one case comes out boldly in support of the thesis that drug addiction results in pathological lying. The thesis must receive general scientific acceptance before the courts can make this approach to the issue of credibility; and, even granted such acceptance, the lag of the courts in utilizing it is likely to be appreciable.'' See also treatment of this problem in McCormick on Evidence, section 45, page 98.

In the absence of any testimony or proffer of testimony of experts to the effect that narcotic addiction does impair the capacity or disposition to tell the truth, or any proof warranting the inference that Horton was under the influence of a narcotic at the time of preparation for or commission of the crime, or when testifying, and in the absence of any attempts to prove these things by cross-examination, we conclude that there was no error in the court's exclusion of the evidence specified in the offers of proof.

 Error is said to reside in the admission of certain conversations between Thwaits and Horton at Torrance in the early morning of December 27th after they returned from San Diego. She was then in bed treating her stab wound and hiding from the police. Thwaits had a conversation with someone whose identity she did not know, which he related to her: ''He said that he had talked to the people down south and they wondered how everything had come off, and he told them that nobody got any money and that Mirabile got shot and I had been stabbed and that the gun was left up there, and they said they were very concerned about me, well, what would I do, and he told them not to worry about me but to worry about themselves, and that is about all there was to that''; also: ''Q. Now, did he get any further phone calls that he related to you the substance of? A. Yes, he did. Someone called him and said that the gun that we used had been registered in their name and that the police were waiting at their house with a warrant for him, and that Mr. Thwaits better try to send him money for an attorney. . . . Mr. Thwaits said that he told them he didn't have any money for an attorney and the best thing he could do was to try to keep his mouth shut because this wasn't some lousy parrots, that this was the gas chamber he was looking at this time. That is about all there was to that.''

It will be noted that these conversations occurred between conspirators almost immediately after their efforts had even-

tuated in murder, while the police were hot on their trail and they were intent on covering up. Each conspirator was bound by the acts of his confederates, even though they were dictated by the exigencies of the moment, if within the general scope of the conspiracy; for instance, evading or resisting arrest falls in this category. "By many authorities, the principle is announced that escape by the perpetrators of a crime in general is part of the conspiracy to commit the crime [citations]; and consequently that the act or declaration of one of the conspirators committed or made by him respectively during the time of such escape is binding upon each and all of the conspirators; from which it should follow that at least during the time that appellant herein was engaged in making his escape from the scene of the robbery he was liable for any act which was committed by his aider and abettor in the commission of the crime." (*People* v. *Corkery*, 134 Cal.App. 294, 296 [25 P.2d 257].)

Fricke on Criminal Law (7th ed.), pages 123-124: "It does not follow that, when the declared object of a conspiracy has been accomplished, the conspiracy is at an end and that there is no further liability to any of the conspirators because of an act of one of its members. In a conspiracy to commit a crime the conspiracy continues not only until that crime has been committed but until the ultimate object of the crime has been accomplished and the liability of the conspirators, as such, extends beyond the mere consummation of the crime. [Citations.] . . .

"While it may not be expressly so agreed, it is obviously tacitly understood by the persons who conspire to commit a criminal offense, and the law is justified in assuming, that the conspiracy includes the evading and resisting of arrest and acts done to that end [citations] and, as indicated in the cases cited, a murder in such an effort to escape arrest makes each conspirator guilty thereof. (See also cases cited under this title.)

"The common design of the conspiracy 'may extend in point of time beyond the actual commission of the act constituting the crime for which the accused is being tried, such as for the purpose of concealing the crime, securing the proceeds thereof, or bribing or influencing witnesses. . . . Of course it must reasonably appear that such acts were committed in furtherance of the common design of the conspiracy. . . .' [Citations.]"

It was just as important for Horton to know of the necessity of evading arrest as it was for Thwaits or for any of the others who telephoned him, and under the above authorities these conversations were competent. (See also *People v. Megladdery, supra,* 40 Cal.App.2d 748, 775-777.) There was no error in the court's rulings with respect to this matter.

Appellant Robearge asserts prejudicial error in the court's receiving evidence which disclosed his former connection with Thwaits in the Los Angeles Jail and in Folsom Penitentiary. When Sergeant Sgobba on February 3, 1959, was interviewing Thwaits, he remarked: "It is obvious Jeanne must have talked." Asked how long he had known Sonny (the only name police then had for the trigger man), Thwaits said he met him in 1949 in the county jail in Los Angeles and later they were inmates together at Folsom. Sgobba, of course, was interested in identifying and arresting the actual killer. Thwaits gave the officer a physical description of Sonny but stated he did not know his last name or the address in Redondo Beach where he resided. He also said he could not tell Sonny's last name as he had a conscience and had to sleep nights. Asked for a shortcut to get the trigger man, Thwaits said: "Go ahead and call Folsom, they will tell you who Sonny is." Sgobba said there were perhaps a lot of Sonnys at Folsom and Thwaits replied, "just ask them for Sonny who used to be a welder up there and they will give you his name." It is obvious that this would lead the police directly to the name of the killer and to his apprehension and trial.

The conversation, of course, disclosed former conviction of a felony, but Robearge later took the stand and admitted the same, thus precluding any effective claim of prejudice (see *People v. Tinnin,* 136 Cal.App. 301, 319-320 [28 P.2d 951]). Moreover, it now is established law that proof of conviction of another crime is proper whenever it becomes relevant and material to proof of the crime involved in the trial.

*People v. McCaughan,* 49 Cal.2d 409, 421 [317 P.2d 974]: " 'It is settled in this state that except when it shows merely criminal disposition, evidence which tends logically and by reasonable inference to establish any fact material for the prosecution, or to overcome any material fact sought to be proved by the defense, is admissible although it may connect the accused with an offense not included in the charge.' (*People v. Woods,* 35 Cal.2d 504, 509 [218 P.2d 981].) "

Witkin on California Evidence says, in section 136, page 158: "There is no fixed category of mutually exclusive exceptions; i.e., intent, common plan, identity, etc., are merely illustrative of the types of relevant facts in proof of which other crimes may be proved as circumstantial evidence. . . . And the cases illustrating the exceptions are so much more numerous than those applying the exclusionary rule that it has been suggested that the true rule could be more realistically stated in affirmative form: That evidence of other crimes is admissible whenever it is relevant to a material issue, and that it should be excluded only where its sole purpose and effect is to show the defendant's bad moral character (disposition to commit crime). [Citations.]" Indeed, the proper approach to the problem seems to be an independent determination of relevancy and materiality rather than a search for exceptions to a so-called general rule. (To the same effect see McCormick on Evidence, § 157, pp. 327, 330.)

Finally appellants complain of refusal of their requested instructions Numbers 36, 37, 35, 32 and 21. Examined in the light of the instructions given by the court and the governing authorities, it appears that each of them was properly rejected for one or more of the following reasons—incorrect in point of law, inapplicable to the facts, misleading or adequately covered by instructions given.

Number 36 says that the Los Angeles court would have no jurisdiction to try the murder charge unless the conspiracy was formed before any act was committed in that county. Such is not the law. If overt acts were done in Los Angeles County after as well as before formation of the conspiracy, those done after would afford basis for Los Angeles jurisdiction and those which preceded the conspiracy properly would be disregarded for jurisdictional purposes. The conversations between Thwaits and Horton, designed to further attempts of the conspirators to evade arrest would fall in the former category. (See *People* v. *Corkery, supra,* 134 Cal. App. 294, 296; Fricke on Criminal Law, [7th ed.], pp. 123-124.)

Number 37 would tell the jury that should they find the conspiracy to have been formed after arrival of Horton in San Diego, then no jurisdiction could exist in Los Angeles County. The law is to the contrary. Upon the assumption stated, any overt act done in Los Angeles County after the return of the conspirators to that county would confer

jurisdiction upon the superior court of that county. (See authorities last above cited.)

Said Number 37 also says with respect to defendant Robearge that "when the attempted robbery and the conspiracy to rob was frustrated, the conspiracy terminated,"— this notwithstanding the fact that it resulted in the murder of Mirabile. Obviously this would have been misleading. "To constitute criminal conspiracy, it is not essential that the object of conspiracy should have been accomplished, and this is the rule even in jurisdictions where the statute requires an overt act in execution of the unlawful agreement." (15 C.J.S. § 44, p. 1070.) "Proof that two or more individuals conspired to commit a crime and engaged in overt acts leading to its commission will sustain a conviction of conspiracy even though they failed to accomplish the object of their intrigue." (*People* v. *Klinkenberg,* 90 Cal.App.2d 608, 635 [204 P.2d 47, 613].) Accord: *People* v. *Gordon,* 71 Cal.App.2d 606, 628 [163 P.2d 110].

Number 35 reads: "You are instructed that acts and statements of alleged conspirators before a conspiracy is formed cannot be considered as overt acts in furtherance of a conspiracy." While this is obviously correct, the matter was fully covered by CALJIC 938 which was given and which says among other things: "The term 'overt act', as used in the law of conspiracy, means any step or act by any one of the conspirators which goes beyond mere planning, agreement and intent toward the accomplishment of the object of the conspiracy, and which is done to effect that object."

Number 32 reads as follows: "You are instructed that the gist of the offense of conspiracy is the formation of a combination with others to do some unlawful act by unlawful means. It is incumbent on the prosecution to prove a criminal agreement (first?) and (thereafter?) an overt act done in furtherance of the objects of the conspiracy." The question marks destroy it and there was no obligation on the judge to correct the requested instruction. As written it refers to the order of proof and misstates the rule. (See *People* v. *Goldstein, supra,* 136 Cal.App.2d 778, 792; *People* v. *Ferlin,* 203 Cal. 587, 599 [265 P. 230].) In *People* v. *Calhoun,* 50 Cal.2d 137, 144 [323 P.2d 427], it is said: "It was not necessary to connect defendant with the conspiracy at the beginning of the evidence or before any other evidence of a conspiracy was received. As defendant concedes, the court had a reasonable discretion as to the order of proof."

Number 21 is a copy of Penal Code, section 790. Giving this instruction as tendered, without any recognition of the doctrine of *People* v. *Abbott, supra,* 47 Cal.2d 362, 369-370, would have been misleading and hence erroneous.

None of these rulings would or could result in prejudicial error.

The judgments of conviction of the respective appellants, Buono, Murray and Robearge, and the order denying new trial as to each said appellant, are affirmed.

Fox, P. J., and McMurray, J. pro tem.,* concurred.

Petitions for a rehearing were denied May 12, 1961, and the petitions of appellants Buono, Murray and Robearge for a hearing by the Supreme Court were denied June 6, 1961.

*Assigned by Chairman of Judicial Council.