[Crim. No. 5642.   Second Dist., Div. One.   Dec. 3, 1956.]

THE PEOPLE, Respondent, v. PATRICK LEE MAHONEY
et al., Appellants.

Morris Lavine, under appointment by the District Court of Appeal, for Appellants.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendants Mahoney and Creswell were charged in Count I with the crime of robbery, committed upon William Heald; Count II charged them with robbery committed upon Robert Perry; and Count III charged robbery committed upon Earl Cutburth. It was further alleged that at the time of the commission of each robbery so charged, the named defendants were armed with a deadly weapon. In Count IV defendants Creswell and Singer were accused of the crime of robbery committed upon Katherine and Clyde Yount, and that at such time they were armed with a deadly weapon. It was further charged that defendant Mahoney had been previously convicted of the crime of robbery, a felony. The motion of defendants Mahoney and Creswell to dismiss the information under Penal Code, section 995, was denied, and defendant Singer's motion for a separate trial was granted, so that this appeal concerns only defendants Mahoney and Creswell. The former pleaded not guilty as to Counts I, II, and III, and the latter pleaded not guilty as to Counts I, II, III, and IV. Each denied the allegation that he was armed with a deadly weapon as set forth in the information. Prior to commencement of the trial, defendant Mahoney admitted the prior felony conviction alleged against him.

Trial by jury resulted in verdicts finding defendant Mahoney guilty as charged in Counts I, II, and III, and defendant Creswell guilty on Counts I, II, III, and IV. The jury found that each offense was robbery of the first degree, and that both defendants were armed with a deadly weapon at the time of the commission of such offenses. The motion of defendant Mahoney for a new trial was denied and both defendants sentenced to state prison. They prosecute this appeal from the judgment of conviction, while defendant Mahoney also appeals from the order denying his motion for a new trial.

In presenting the factual background surrounding this

prosecution no mention is required of Count IV, because at the trial defendant Creswell admitted the offense therein charged and does not seek a reversal of the judgment on that count. Defendant Mahoney was not accused of the crime charged in Count IV.

As to the remaining Counts I, II, and III, the record reflects that on June 21, 1955, Mr. Heald (the victim in Count I) was on duty as a clerk in Thompson's Liquor and Sporting Goods Store at 1182 Wardlow Road, Signal Hill, Los Angeles County. That evening about 10 o'clock, while two customers, Robert Perry (the victim in Count II) and Earl Cutburth (the victim in Count III), were in the store, Mr. Heald walked to the back room of the store where he saw a man "duck" down behind the cases. Mr. Heald asked him what he was doing there. Another man, who had a woman's stocking over his face and chin, and whom Mr. Heald believed to be the defendant Creswell, as his build and size resembled the man's, stepped around the corner carrying a lever action rifle which was cocked and ready to fire. He said, "This is a hold-up. Don't make any noise and don't move." Mr. Heald turned and started to walk away. The man said, "Don't go any further, that is far enough." Mr. Heald returned. The man who had "ducked" behind the cases came out, walked Mr. Heald between two cases, told him to lie face down, and taped his wrists behind his back.

The man with the rifle went to the front of the store and said to the two customers there, "You two guys in the back room." They got up and went into the back room where the man with the rifle, who looked like the defendant Creswell to Mr. Cutburth, told them to go into the same aisle that Mr. Heald was in, lie down, and put their hands behind their backs. They did so. The man tied Mr. Cutburth's hands, but did not tie Mr. Perry's.

One of the men took from Mr. Heald his wallet containing a dollar bill; took from Mr. Perry an Elgin watch and his wallet containing a dollar, a driver's license, Social Security Card and Navy discharge card; and took from Mr. Cutburth his wrist watch and wallet containing a dollar. After they left, Mr. Perry cut the tape off the wrists of the other two.

Mr. Heald immediately discovered that there were missing from the store about 38 hand guns of different types, money from the cash register, a pair of binoculars, a double barreled Stevens shotgun, and assorted ammunition. An inventory

was made by Mr. Thompson, the owner of the store, and a list of the descriptions and serial numbers of the missing articles was made. Included in the list was a Colt Cobra .38 Special Number 25367; a 380 Colt automatic Number 58487; a Smith and Wesson .38 Special Number 178652; a 3222 Smith and Wesson Number 2310; and a Stevens shotgun, 12 gauge.

Patrolman Overton, of the Signal Hill Police Department, arrived at the store in answer to a report of a robbery. There he found a lady's silk stocking and a silk handkerchief behind the counter from which the guns were missing.

About 7:30 a. m. on June 22, 1955, Jose Sanchez Acosta, a uniformed police officer of the city of Tijuana, Mexico, was on duty. He heard four or five shots, and started to go in the direction of the shooting. As he went, he heard more shots. When he got to the scene of the shooting he saw a uniformed policeman and a uniformed traffic officer lying wounded in the street, a man lying in the gutter, and another lying on the sidewalk shooting at other officers who were shooting at him. He saw two guns in the possession of the two men. He also saw a 1946 Pontiac about two meters from the man who was on the sidewalk shooting, and about a meter and a half from the one on the street. A fellow officer picked up the guns. Officer Acosta assisted in putting the man who had been lying on the sidewalk into the ambulance which arrived. He was unconscious.

Officer Acosta and his companion took the guns, which the latter had picked up, to the police station. His companion opened the gun which had been taken from the man on the sidewalk, and he said that there were no more shells in it.

Ignacio Perez Lara, a state police officer of Baja California, arrived at the scene of the shooting. He saw the two wounded Mexican officers there, and also two Americans. He took the officers to the hospital in his car. Five or ten minutes after he reached the scene of the shooting, he saw at the hospital, the two men who had been shot, and they were the defendants.

Lieutenant Commander Blanco of the United States Navy, liaison officer for military between Mexico and the United States to investigate matters that affected service personnel, went, on June 22, to the scene of the shooting in Tijuana and saw the defendants there. He saw them put into the ambulance, and followed the ambulance to the hospital.

At the hospital they were taken to a ward, where they were separated by an archway. Defendant Mahoney was injured and bleeding from his arm and hips, and he was unconscious. Defendant Creswell had been shot in the shoulder and was bleeding from several other places. He was lying on a wheeled table. He had not, as far as Commander Blanco knew, had any sedative or anything of that type administered.

About five minutes after defendant Creswell arrived at the hospital, Commander Blanco had a conversation with him. He was in pain, but he answered the commander and the commander could understand what he was saying. His statements were freely and voluntarily made. Commander Blanco called him "Perry." He had in his possession an I.D. card which the doctor had given him with "Robert Perry" on it. Creswell said, "My name isn't Perry. My name is Creswell." "Get me a doctor," he added. Commander Blanco said, "O.K., just as soon as they get through with the other two patients they'll wheel you into the operating room." Then he said to Creswell, "Now I want to know where you got them guns, where you fellows got them guns." Creswell asked him for a doctor the second time, and the commander said, "They'll take care of you; just wait a while until they get through, but I want to know where you fellows got them guns." Defendant Creswell finally told him, "We held up a sporting goods store in Long Beach." That was the end of the conversation.

About four hours after the shooting, Lieutenant Lara and a superior officer opened the back of the 1946 Pontiac with a crowbar and found therein a box containing 15 guns. An official list of the guns was made by the superior officer.

Chief of Police Murphy and Sergeant Morrow, of the City of Signal Hill, went to Tijuana on June 22, 1955. On June 23 they entered a room in which the defendants were. Mahoney was lying on a bed parallel to, about four feet from, and slightly higher than the cot on which Creswell lay, with his head in the same direction. Creswell had a bandage on his right shoulder and a blanket over him, and Sergeant Morrow could see a bandage on one of Mahoney's thumbs and a sheet over his body.

Sergeant Gayton of the San Diego Police Department who had accompanied them into the room, introduced them to Creswell. Chief Murphy, who bent down over Creswell, said that he was from Signal Hill and that he wanted to

talk to him about the sporting goods store. He asked Creswell, "Was it just the two of you—just you two on the job, or someone else?" He replied, "Just us two." The chief asked, "Did you carry the gun, or did someone else?" and he replied, "I carried the gun." Chief Murphy asked, "Whose car did you use?" and he replied, "We used my car." The chief said, "The guns that were used down here in Mexico, were they some of the guns that came out of the Signal Hill job?" and he replied, "Yes, I had a 380 automatic and Pat had a snubnose." "I'm worried," he continued, "I don't know what's going to happen to those Mexican officers. Do you know how they are? Do you think they are going to die?" Chief Murphy said that he didn't know anything about the condition of the officers. "Who started it down here?" the chief asked, and Creswell replied, "We did." Chief Murphy asked, "The guns in the car, was that all of the guns that came out of the store in Signal Hill?" and he replied, "No, we left half of them there and just brought half of them down here." The chief asked where the ones were that they didn't bring down, and he replied that he wanted to talk to "him" or "my friend" or something like that. Creswell had spoken in a lower than normal voice, and slowly at times, but his responses had been coherent.

Chief Murphy then walked around defendant Mahoney's bed, introduced himself and Morrow, and said that they were from Signal Hill, and that they wanted to talk to him about the store up there. He asked Mahoney, "Were there more than two on the job up there, or just you two?" Mahoney replied, "Just us two." The chief asked, "Whose car did you use?" and he replied, "His car." Chief Murphy asked, "Who carried the gun?" and Mahoney closed his eyes without answering the question.

While Chief Murphy was in the room, defendant Creswell was being given something in the vein of his arm, and was given an injection during the conversation.

Sergeant Morrow also had conversations with the defendants after Chief Murphy talked to them. No force or violence or threats of any kind were used against either of them, and their statements were made freely and voluntarily. He asked Creswell how he felt, and he said, in the "low voice of a sick man," "I'm really in a jam this time." Sergeant Morrow asked him who carried the rifle in the hold-up in Signal Hill, and he said he carried it himself. Sergeant

Morrow then talked to defendant Mahoney. He asked him if there was anyone else present in Signal Hill at the liquor store when it was held up besides him and Creswell, and Mahoney nodded toward Creswell and said, "Just us two." Sergeant Morrow asked Creswell if he wanted to tell them where the rest of the firearms were. He replied that he would have to discuss it with Mahoney first.

The officers left the room, and a few minutes later returned and talked to Creswell. Chief Murphy asked him about the guns again, and he said that they were in a car "parked in front of Pat's house."

After Chief Murphy and Sergeant Morrow left the hospital where Mahoney and Creswell were, they went to the police department in Tijuana and talked to persons there. They checked some firearms that were there and made a list of them. There were 15 guns at the police station, and two additional ones which had been taken into the possession of the Tijuana police. They had a list with them, and compared the numbers on the guns against that list. They were identical.

Later that evening they returned to Signal Hill, where they found a message that the father of defendant Creswell wanted Sergeant Morrow to call him. Sergeant Morrow called him and had a conversation with him over the telephone. He went out to Mr. Creswell, Sr.'s, house in Lakewood and had a further conversation with him. Sergeant Morrow and Mr. Creswell, Sr., went to an address in Compton, where there was a 1940 Ford, that they had been informed belonged to the defendant Creswell, parked in front of defendant Mahoney's residence. At the request of Mr. Creswell, he got a key man to open the car. In the turtle back of the car there were 12 revolvers and pistols, a pair of binoculars and some small arms ammunition. Sergeant Morrow had a list of missing guns and binoculars which he checked against the contents of the Ford, and they "checked out."

On June 28 Sergeant Morrow and Chief Murphy went to the home of defendant Mahoney's father. The latter took them to the garage in the rear of his residence, went inside, reached up over a shelf above the garage door, took down a shotgun and rifle, and gave them to the officers.

About 1 p. m. on November 2, Acting Chief of Police Heier of Signal Hill, had a conversation with Creswell at the Long Beach city jail. The officer had with him at that time a silk stocking, a red handkerchief and a supply of

adhesive tape. No force or violence or threats of any kind were used against Creswell; no promises of immunity or other reward were extended to him to get him to talk; and his statements were free and voluntary.

Chief Heier asked Creswell if he recalled the robbery at the Thompson's sporting goods store at Signal Hill at Wardlow and Orange. He said that he did. The chief asked him if he carried a 30-30 rifle in the back door and he said that he did. When the chief asked him who was with him, he said that it was another guy. "Was it Pat Mahoney?" asked the chief, and he replied, "I would rather not say."

Chief Heier asked, "What did you do with the rifle?" and Creswell answered, "I went into the store and pointed it at the owner." The chief asked him if he meant the owner or the clerk, and he answered, "Yes." When he asked him what he told the clerk, he replied, "I told him 'Come on back here.'" He said that he came back and they had him sit on the floor in the storeroom, and the other fellow taped his hands. He said he went out in the store again and told the two men there to come back, pointing the rifle at them also. He agreed, in answer to questions, that the two men were also made to sit on the floor and that their hands were taped; that the tape which the chief had, appeared to be similar to the tape used to tape the victims' hands; that he had seen the red silk handkerchief and stocking before, and that they had them over their foreheads and eyes; that he wore the red handkerchief, and could see through it; and that the man with him had the stocking over his head. Creswell stated that they gathered up the guns and ammunition and went to Pat Mahoney's house where they divided them and put them into two wooden boxes; that they put the ones that they wanted to keep in a box and put it in the trunk compartment of his car and locked it, and put the ones they wanted to sell in Pat's car. He said that they then drove to Tijuana, Mexico, in Mahoney's car and spent the bigger part of the night in a bar until about 7 a. m.; that they went to a service station where Creswell took a "fix," and almost took too much because he passed out for three or four minutes; that they left the service station and contacted a cab driver to whom they offered a gun for sale; that the cab driver hailed a passing police car and told the officers something in Spanish; that the officers stopped the car, got out and approached them,

and asked them if they had guns; that they replied "Yes," and each drew his gun and started to fire at the officers.

On behalf of defendant Mahoney, his mother, Kathleen Mahoney testified that on June 21 (the night of the robbery charged in Counts I, II, and III) the Mahoney family, consisting of defendant Mahoney, the witness, her little granddaughter age 2½ years, and the husband and mother of the witness, were all at home. The alibi testimony was that defendant Mahoney was in his room typing and listening to his radio. During the evening his mother fixed him something to eat. Mr. Mahoney, Sr., retired about 9:30 p. m., and shortly thereafter, about 10 o'clock Mrs. Mahoney went to Pat's door and said, "Good night, Pat." At the time, he was typing. About 10:30 Mrs. Mahoney's mother, Mrs. Blacker, pushed Pat's (defendant Mahoney) door back a little bit and said, "Good night, Pat." He answered, "Good night, Grandma." She went to bed. About 12 o'clock, Pat was talking to someone, and it awakened his mother. She started to go to the door of his room and tell him to be quiet and not awaken his father. She heard them talking, and believed that it was the defendant Creswell's voice.

The mothers of both defendants testified to seeing their sons on the morning of June 23 at the hospital in Tijuana, Mexico; that in the case of defendant Creswell his voice was weak. His mother talked with him for three or four minutes, saw him receive an injection with a needle; thereafter his replies to her questions were weaker, and finally he did not respond at all. Later in the morning his voice was weaker than normal, but she did not have any difficulty in communicating with him at that time.

Mrs. Mahoney visited her son about 9 a. m. on June 23. He was in a hospital room with defendant Creswell. She believed that her son knew her. Creswell testified that between 11:15 and 11:30 on the night of June 21, 1955, he met, without appointment, two boys whom he had met in reform school prior to his departing from it on June 1, 1954, at the L. J. Drive-in on Atlantic Avenue. They were 19 or 20 years old. They talked for a while and then they told him they had some stolen guns. Creswell saw them in two boxes in the boys' car. There was a billfold lying on top of one of the boxes. Creswell was told to deliver the guns to a man named "Wedo" in front of the Macambo bar in Tijuana. The boxes of guns were put in Creswell's car. He was to receive one and a half ounces of heroin from

"Wedo," and was to return with it. A rifle and a shotgun were also turned over to him. He put them into the back of his car.

Defendant Creswell further testified that at 12 or 12:15 he went to Mahoney's home in Compton, took the rifle and shotgun into .the house and asked if he would like to go to Tijuana with him. He put the rifle and shotgun in the closet and put one box of guns into Mahoney's car and left the other in his car. They proceeded to Tijuana, arriving about 3:30 in the morning. They went to the Macambo where, in the street outside of the bar, they inquired for "Wedo" of a taxicab driver, as he had information that the taxicab driver would know where he was. The driver said that he was not around. Creswell went into the Macambo where he remained until 6:50 in the morning, and then went out and was approached by the taxicab driver, who told him that he knew that he had guns, and that he would like to buy them. Creswell said that he would sell him one. At that time they were approached by two men in khaki pants and leather jackets. The men told them to hand over the guns. Defendant Creswell started to go to the car with defendant Mahoney. Their backs were to the two men. Creswell heard shots. He stopped and turned around. Mahoney was lying on the ground. The two men were shooting, one of them at Creswell. Mahoney was not shooting, but Creswell shot three times. While Creswell was shooting, both of the men went down. Creswell was hit in his chest and his left leg. He went down by the car. Other men joined in the shooting after the first two were down, and shot at Mahoney. Creswell became unconscious for a while. The next thing he knew he was being kicked. He was thrown on the back of a truck. He did not remember getting to the hospital. He woke up in the hospital on a cot. He did not know how long he had been there. He was in pain. He was naked, and there was a sheet over him. He asked for a doctor. No doctor came until the next day. He gave him a "shot." He remembered Chief Murphy, but no other men. He did not remember talking to Chief Murphy.

Creswell testified further that he talked with Deputy Sheriff LaBas at the Norwalk Police Station in November about the incident in Tijuana, but not about the robbery of the liquor store in Signal Hill on June 21, 1955. He talked about the robbery of the Younts (Count IV) ; that the testimony of Mr. and Mrs. Yount was true—that he (Cres-

well) robbed the store operated by the Younts on October 30, 1955.

He testified that at a conversation with Mr. Heier he was shown a stocking and piece of cloth and asked if those were the ones that he used in the robbery, and he answered, "No"; that he told Mr. Heier that he "didn't pull any robbery."

As a first ground for reversal, appellants contend that "The confessions which were obtained in the Tijuana Hospital from the defendants, and each of them, were in violation of due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States, and Article I, section 13, of the Constitution of California. They were obtained under conditions that were not, and could not be, free and voluntary. No proper foundation was laid for their use or admission."

■ Appellants' claim that under the circumstances here present they "were not in a physical or mental condition to make a free and voluntary confession" cannot be sustained. The evidence discloses that there was no force or violence used on appellants and that there were no promises of immunity from punishment, and that they spoke voluntarily. The *prima facie* showing that the confessions were voluntary was not disputed. As was said in *People* v. *Amaya*, 40 Cal.2d 70, 77 [251 P.2d 324], "Any evidence tending to show that appellant may have been in pain when he gave the statements at the hospital did not affect their admissibility but only the jurors' consideration of the weight and effect to be given them (citing cases). His possible pain was in no wise shown to reflect on his competency." (See also *People* v. *Harrison*, 41 Cal.2d 216, 218 [258 P.2d 1016]; *People* v. *Cobb*, 45 Cal.2d 158, 162 [287 P.2d 752].) That appellant Creswell was mentally alert is evidenced by the fact that when Commander Blanco called him "Perry," as appellant's name appeared on an identification card that had been given to the witness, appellant Creswell replied that his name was not "Perry," that it was "Creswell." When Chief Murphy and Sergeant Morrow interviewed him at the hospital, Creswell was asked "Was it just the two of you—just you two on the job?" The answer was "Just us two." When the Chief inquired, "Did you carry the gun or did someone else?", Creswell replied, "I carried the gun." In answer to the question, "Whose car did you use?" the answer was, "We used my car." When questioned as to whether "the guns that were used down there in Mexico, were they the same guns that came out of the Signal

Hill job?'' appellant Creswell answered, ''Yes, I had a 380 automatic and Pat (appellant Mahoney) had a snub-nose.'' Appellant Creswell inquired as to the condition of the wounded Mexican police officers, and asked ''Do you think they are going to die?'' Appellant Creswell then stated with reference to the guns in the automobile, that ''We left half of them there and just brought half of them down here.'' When queried as to where the guns were that they left ''there,'' appellant Creswell answered that he wanted to talk to ''him'' or ''my friend,'' or ''something like that.''

When Chief Murphy and Sergeant Morrow talked with appellant Mahoney, the chief stated that they were from Signal Hill and wanted to talk to him ''about the store up there.'' Chief Murphy asked appellant Mahoney ''Were there more than two on the job up there, or just you two?'' Mahoney replied, ''Just us two.'' The chief asked, ''Whose car did you use?'' and he replied, ''His car.'' Chief Murphy asked, ''Who carried the gun?'' and Mahoney closed his eyes without answering the question. In a subsequent conversation with appellant Mahoney, Sergeant Morrow inquired if there was anyone else present in Signal Hill at the liquor store when it was held up besides him and Creswell, and Mahoney nodded toward Creswell and said, ''Just us two.'' Sergeant Morrow asked Creswell if he wanted to tell them where the rest of the firearms were. He replied that he would have to discuss it with Mahoney first.

We are satisfied that the foregoing reasonably justifies the conclusion that while appellants may have been in pain and weakened as a result of their injuries, they certainly were conscious of the meaning of the interrogatories propounded to them and answered them with a conscious knowledge of their import, and a realization of what was being said in answer thereto. There was therefore no error committed by the trial court in admitting the conversations into evidence.

Appellants' next claim is that the court committed prejudicial error in failing to instruct the jury properly on the law of confessions and in failing to submit to the jury the issue of whether or not confessions given by the former were free and voluntary. In the instant case, at the time the confessions were offered in evidence the prosecution laid the foundation for their introduction by preliminary proof showing that they were freely and voluntarily made. Appellants were accorded the opportunity for *voir dire* examination as requested by them to overcome the prima facie showing. The court, as

was its duty in the first instance, in the exercise of its discretion determined that the confessions were freely and voluntarily made and permitted them to be read to the jury. However, appellants' complaint is that the court failed to perform its required duty to submit to the jury, under proper instructions, for its determination, the question whether under all the circumstances the confessions were made freely and voluntarily. ▇ It must be conceded, as contended by appellants, that while the court passes preliminarily on the question of the voluntary nature of the confession and its admissibility, and although the court may determine that the confession is voluntary and admissible, its ruling is not binding on the jury, and it is for that body "to determine in the last analysis whether a confession is freely and voluntarily made" (*People* v. *Gonzales*, 24 Cal.2d 870, 876, 877 [151 P.2d 251].) ▇ We are satisfied that in the case at bar appellants were not prejudiced. In the case now engaging our attention, insofar as the instructions were concerned, the matter of the free and voluntary aspect of the confessions was certainly left open for the jury's consideration. There was no instruction explicitly directing them that they could not consider the question. It could be held that a complete answer to appellants' complaint, assuming that the statements were confessions, is that they did not request any instructions on the subject. If they were relying on such reconsideration by the jury and desired an explicit direction to that body that it had the power to redetermine the same and reject the statements of appellants as evidence, if from the testimony on that subject they believed that the statements were not freely or voluntarily made by reason of appellants' physical and mental condition, they should have asked an instruction to that effect. We are impressed that this case comes within the purview of those decisions holding where, in similar cases, such an instruction is not asked, the accused cannot assign the mere failure of the court on its own motion to give the same as error sufficiently prejudicial for reversal (*People* v. *Meichtry*, 37 Cal.2d 385, 390 [231 P.2d 847] ; *People* v. *Collins*, 48 Cal. 277, 278; *People* v. *Gray*, 66 Cal. 271, 276 [5 P. 240] ; *People* v. *Northey*, 77 Cal. 618, 631 [19 P. 865, 20 P. 129] ; *People* v. *Marks*, 72 Cal. 46, 47 [13 P. 149] ; *People* v. *Flynn*, 73 Cal. 511, 514 [15 P. 102] ; *People* v. *McLean*, 84 Cal. 480, 482 [24 P. 32] ; *People* v. *Appleton*, 120 Cal. 250, 252 [52 P. 582] ). We find no ground upon which to distinguish the case at bar

from the foregoing decisions, and we think the same rule applies.

As a further reason why appellants suffered no prejudice in the instant case, we are impelled to point out that the jury was instructed that they were the judges of the value and effect of evidence and of the credibility of the witnesses. They were also admonished that ''Evidence has been received in this case tending to show that on ~~an occasion~~ (occasions) other than this trial ~~the~~ defendant himself made ~~a statement~~ (statements) tending to prove his guilt of the alleged crimes for which he is on trial.

'' (A statement thus made by a defendant may be either a confession or an admission.)

''A confession is a statement that was made by one who is a defendant in a criminal trial, at a time when he was not testifying in that trial, by which he acknowledged certain conduct of his own that constituted a crime for which he is on trial, a statement which, if true, discloses his guilt of that crime and excludes the possibility of a reasonable inference to the contrary.

''*If under my instructions you find that a voluntary confession was made, you are the exclusive judges as to whether or not the confession was true; and in deciding that question you should consider all the circumstances connected with the making of the statement, as shown by the evidence.*'' (Emphasis added.)

We conclude that in the absence of a request that the court instruct the jury as to their right to reconsider the question of whether or not the so-called confessions were freely and voluntarily given; coupled with the instructions given as to the right of the jury to consider ''all the circumstances connected with the making of the statement,'' no constitutional rights of appellants were violated or infringed upon.

Finally, appellants assert that the evidence was insufficient to support the verdicts, in that none of the three victims could sufficiently identify appellants as the robbers. This contention is unavailing. We shall not here repeat the testimony concerning identification. ■ Suffice it to say that in order to sustain a conviction it is not necessary that the identification of the accused as the perpetrator of the crime be made positively or in a manner free from all inconsistencies. ■ It is the function of the jury to pass upon

the strength or weakness of the identification and the uncertainties of the witnesses in giving their testimony. The evidence admitted as to identification was competent; the weight to be given to it was a problem for the jury. (*People v. Rolfe*, 61 Cal. 540, 543; *People v. Flood*, 41 Cal.App. 373, 377 [182 P. 766]; *People v. Baker*, 94 Cal.App. 628, 633 [271 P. 765].) There was also evidence of the possession by appellants of recently stolen property and other inculpatory circumstances supporting a finding of participation in the robbery; and added to this is the admission of appellants that they committed the robberies charged against them.

For the foregoing reasons, the judgments of conviction as to each defendant are, and each is, affirmed, as is the order denying defendant Mahoney's motion for a new trial.

Doran, J., and Fourt, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 2, 1957.