[Crim. No. 3888. First Dist., Div. One. Aug. 13, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN EMILIO DIAZ et al., Defendants and Appellants.

Walter M. Oros and Jerome C. Utz, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk, Attorney General, John S. McInerny and Albert W. Harris, Jr., Deputy Attorneys General for Plaintiff and Respondent.

BRAY, P. J.—Defendants appeal from judgments of conviction after jury trial. Each was separately found guilty of three offenses: (1) violation of section 11500, Health and Safety Code (sale of heroin); (2) violation of section 11500 (offer to sell heroin); and (3) violation of section 182, Penal Code (conspiracy to offer to sell heroin).[1]

### QUESTIONS PRESENTED

1. Alleged abuse of discretion in denying defendants' motions to withdraw plea.

2. Alleged error in refusing to quash the indictment.

3. Alleged error in consolidating information and indictment for trial.

---

[1] Diaz admitted five prior convictions; Siegel admitted three.

4. Alleged lack of speedy trial.
5. Restriction of cross-examination of witness Mantler.
6. Effect of delay in giving information concerning the informer.
7. Alleged improper cross-examination of defendant Siegel.
8. Failure to grant Diaz' motion to dismiss sale charge.
9. Alleged entrapment.
10. Alleged misconduct of district attorney.
11. Have defendants been subjected to multiple punishment?

RECORD

In 1959 defendants were convicted of violating section 11500, Health and Safety Code (sale of heroin). On appeal, *People* v. *Diaz* (1959) 174 Cal.App.2d 799 [345 P.2d 370], we reversed the conviction because of the refusal of the prosecution to disclose information concerning the informer Tomlinson. When the cause came on for resetting, new counsel were appointed, and defendants moved for leave to withdraw their pleas of not guilty for the purpose of moving to set aside the information on the ground that they were not properly advised of their right to counsel at the arraignment in the municipal court. In the meantime, an additional complaint was filed in the municipal court charging defendants with offering to sell heroin and with conspiracy to offer to sell heroin. Thereafter an indictment was returned by the grand jury charging the same offenses. This was filed in the superior court after defendants' motion to withdraw pleas had been denied. Defendants' motion to quash the indictment was denied, as was a petition for a writ of mandate directing the municipal court not to dismiss the charges there filed.

The information upon which the first trial was had, and the indictment, were consolidated for trial. Then, on arraignment on the indictment, defendants stood mute. Pleas of not guilty were entered for them. On the trial each was convicted of all three offenses.

Inasmuch as no contention is made that the evidence was insufficient to support the verdicts, only a brief summary of the facts dealing with the commission of the offenses will be given.

On April 4, 1957, at San Jose, State Narcotic Agent Mantler, in the presence of informer Tomlinson and with Deputy Sheriff Best concealed in the trunk of Mantler's car, purchased 1 ounce and 5 grams of heroin from defendants. As soon as the sale was consummated defendants together negoti-

ated with Mantler for further sales. After discussion of quantity and time of delivery, defendant Siegel agreed to call Mantler on Wednesday. Subsequent telephone conversations took place between Siegel and Mantler culminating in an arrangement to meet on April 13. Mantler met Diaz and Siegel and defendants agreed to deliver Mantler 2 ounces of heroin for $800. Diaz suggested that Mantler take more on consignment. Siegel suggested that Mantler in his car lead them to a safe place for completing the deal. Mantler drove to Burlingame, followed by defendants in another car. There Mantler and other officers arrested defendants. In the car of the latter a total of 2,612 grains of heroin was found.

At the trial, Diaz did not testify. He offered the depositions of two used car salesmen to the effect that he was in Los Angeles on April 4 and 5.

Siegel testified, admitting being present on the above mentioned occasions but denied knowing anything about the heroin or that Diaz was with him on April 4. He admitted phoning Mantler but only to "spoof him along."

## 1. *No Abuse of Discretion.*

After the return of the remittitur on the prior appeal, defendants moved to withdraw their pleas of not guilty so that they might make a motion under section 995, Penal Code, to dismiss the information on the ground specified in that section "That before the filing thereof the defendant had not been legally committed by a magistrate" in that on their arraignment in the municipal court, the magistrate did not properly inform them of their rights to counsel.[2]

Failure of the committing magistrate to inform a defendant of his right to counsel justifies an attack on the information under section 995 on the ground that the defendant " 'had not been legally committed. . . .' " (*People* v. *Malowitz* (1933) 133 Cal.App. 250, 255 [24 P.2d 177].)

The law is well settled that a motion under section 995 to set aside an indictment or information "must be made in the court in which the accused is arraigned before demurrer or plea and that a failure to so move at that time constitutes a waiver of any future objections." (*People* v. *Egan* (1946) 73 Cal.App.2d 894, 897 [167 P.2d 766]; *People* v. *Brown* (1946) 72 Cal.App.2d 717, 719 [165 P.2d 707]; *People* v. *Ahern* (1952) 113 Cal.App.2d 746, 750 [249 P.2d 63]; *In re Tedford* (1948) 31 Cal.2d 693, 694 [192 P.2d 3].)

[2]This contention applies only to the charge in the information.

However, a court, in spite of such waiver, may allow a defendant to withdraw his plea of not guilty and allow him to make the motion under section 995 which he should have made theretofore. In effect the court is allowing such defendant to withdraw his waiver. However, the defendant is not entitled as a matter of right to withdraw his plea.

A motion to withdraw the plea of not guilty is addressed to the sound discretion of the trial court. (*People* v. *Lee* (1860) 17 Cal. 76, 80; *People* v. *Crowder* (1945) 69 Cal. App.2d 304, 310 [158 P.2d 988].)

The court did not abuse its discretion in denying defendants the opportunity of questioning the instruction given them by the committing magistrate concerning their right to counsel, primarily because they did not raise this question timely. They were represented by counsel at their first arraignment in the superior court and at the first trial in that court. At none of such times did they complain about the lack of instruction given them by the committing magistrate. Likewise they made no contention concerning the matter on the prior appeal.

In *People* v. *Harding* (1953) 116 Cal.App.2d 65, 66 [252 P.2d 1007], the court said concerning the defendant's claim in an application for a writ of error coram nobis that he was not informed of his right to counsel at the preliminary hearing. "If any deficiency existed, the matter could have been raised by moving to set aside the information or by other appropriate and timely action." (P. 66.)

In *People* v. *Miller* (1932) 123 Cal.App. 499 [11 P.2d 884], it was held that the trial court abused its discretion in not allowing the defendant to withdraw his plea of not guilty where the court found that the committing magistrate had not informed the defendant of his right to counsel. In holding that the defendant had not waived his right to complain of this failure to instruct him, the court said, "The defendant made his application at the first time afforded him after he had the aid of counsel." (P. 503.) In our case this is not true.

In *People* v. *Crowder, supra,* 69 Cal.App.2d 304, in holding that the trial court did not abuse its discretion in denying the defendant the right to withdraw his pleas of not guilty and not guilty by reason of insanity, on the ground that he was insane at the time he testified before the committing magistrate and was not then represented by counsel, the reviewing court pointed out, "The motion was not presented

at the first opportunity presented when counsel was first appointed to represent him.'' (P. 309.)

The record of the arraignment of defendants by the committing magistrate discloses that the only instruction on the subject of the right to counsel given them was, ''At this time each of you is informed by this Court of your right to counsel, that is, a lawyer at all stages of the proceedings.'' This instruction complied literally with section 858, Penal Code, which in pertinent part states merely that· when a defendant is brought before the magistrate upon an arrest, ''the magistrate must immediately inform him . . . of his right to the aid of counsel in every stage of the proceedings.'' However, section 859 provides that the magistrate ''shall immediately . . . inform him of his right to the aid of counsel, *ask him if he desires the aid of counsel,* and allow him a reasonable time to send for counsel. . . . *If the defendant desires and is unable to employ counsel, the court must assign counsel to defend him.*'' (Emphasis added.) Section 987 contains similar language. The instruction given defendants by the magistrate obviously did not comply with these sections. Under these sections it is the duty of the magistrate to initiate an inquiry into the desire of a defendant to be represented by counsel, to inquire into his ability to procure counsel, and in the event of his inability so to do, to assign competent counsel to conduct his defense. (See *Bute* v. *Illinois,* 333 U.S. 640, 674 [68 S.Ct. 763, 92 L.Ed. 986].) Had defendants moved under section 995 to dismiss the information the failure of the magistrate to fully instruct defendants would have required the dismissal of the information. But in view of the failure of the defendants, after counsel had been appointed to represent them at the time of arraignment in the superior court, to raise the question of the magistrate's failure to instruct, it was too late to raise the question on the retrial. The court, at any rate, did not abuse its discretion in refusing to permit defendants to withdraw their pleas. The preliminary examination was not held until 14 days after they had been told that they had the right to counsel at all stages of the proceedings, and at the preliminary examination they announced themselves ready to proceed with the examination. At the preliminary examination the court advised defendants not to testify, and they did not testify. In any event, these facts could be considered by the superior court in denying them, after a complete trial, the right to raise the question.

662

Defendants' claim of injury because of the failure of the magistrate to fully inform them of their right to counsel is specious. They say that had the court told them that it would appoint counsel for them, rather than limiting its statement to the fact that they were entitled to counsel, they would have asked for counsel (they do not explain why, with their experience, the thought of having court appointed counsel did not occur to them, if it did not). And say they, that had they had counsel the court would have ordered the prosecution to disclose not only Tomlinson's name which the prosecution did disclose, but his whereabouts. It was the position of the district attorney and of the superior court that defendants were not entitled to any information concerning Tomlinson, other than his name. Thus it is reasonable to assume that with counsel, defendants would not have received any more information than they did.

2. *The Indictment.*

█ As heretofore stated, the first trial was based upon an information charging defendants with the sale of heroin. After the reversal of the conviction of that charge, a complaint was filed in the municipal court charging defendants with offering to sell heroin and with conspiring to offer to sell heroin. Thereafter, instead of proceeding on this complaint the district attorney obtained an indictment charging defendants with these two offenses. Thereafter the trial court denied defendants' motion to quash the indictment.

Defendant Siegel contends that because of the complaint on file in the municipal court, as to which a preliminary examination date had been set, the superior court had no jurisdiction to accept an indictment for the same offenses charged in the complaint.[3] This identical contention was answered adversely to defendant in *People* v. *Collins* (1922) 60 Cal. App. 263, 270 [212 P. 701], where the court said: "It appears that before the indictment herein was found and returned by the grand jury a complaint or deposition was filed in the justice's court of the township of Placerville charging the defendant with the crime herein charged, and a warrant thereupon issued for his arrest. The defendant contends that, this course having been adopted in the first instance, it was the duty of the authorities to take him before the magistrate

[3]Defendant also sought a writ of mandate from the superior court directing the municipal court not to dismiss this complaint, as requested by the district attorney. The superior court ·denied the application.

before whom the deposition was filed and by whom the warrant was issued and there subject him to a preliminary examination; that, because of the fact that the district attorney so proceeded in the first place, the grand jury was without authority to investigate his case and return an indictment against him, and, therefore, the indictment was not valid and was wholly insufficient to clothe the superior court with jurisdiction to try him. Of course, there is absolutely nothing in this point.''

Defendant Diaz contends that as to the conspiracy count of the indictment, the Superior Court of Santa Clara County had no jurisdiction because the overt act alleged is that defendants transported heroin to the city of Burlingame which is in San Mateo County. Defendants likewise, at the end of the trial, moved to dismiss this count on the ground that there was no evidence of conspiracy in Santa Clara County.

The charge of conspiracy may be tried in any county in which an overt act was committed by any of the conspirators. (Pen. Code, § 184.) An overt act to effect the object of a conspiracy may itself be a legal act; it may be preliminary to the crime itself, and it may be committed by only one of the coconspirators. (*People* v. *Buono* (1961) 191 Cal.App.2d 203, 223 [12 Cal.Rptr. 604].)

In *People* v. *Buono, supra,* where the meeting of the conspirators took place in one county (Los Angeles) and there started their journey to another county (San Diego) where the overt acts took place, it was held that the Los Angeles Superior Court had jurisdiction of the conspiracy charge. Thus, in our case the indictment charged the conspiring to commit the crime to have occurred in Santa Clara County, with an overt act occurring in San Mateo County.

The first act of the conspiracy was the meeting of the defendants with Agent Mantler and the informant Tomlinson in Santa Clara County when after an ounce of heroin was sold by defendants to Mantler, defendants offered to sell 2 ounces more in the future. Later, defendant Siegel called Mantler from Santa Clara County and requested a meeting at Paul's Barbecue in Santa Clara County. There discussion of the impending sale was had by Mantler with defendants. Thereafter defendant Siegel made three calls from Santa Clara County to Mantler concerning the sale. Finally Mantler met defendants in San Mateo County where defendants were arrested and found with approximately 4 ounces of heroin.

Thus the action could have been brought in either Santa Clara or San Mateo County as overt acts took place in both counties, and, as in *People* v. *Buono, supra,* 191 Cal.App.2d 203, the conspiracy commenced in the county where the indictment was found. Hence the Superior Court of Santa Clara County had jurisdiction. See *People* v. *Megladdery* (1940) 40 Cal.App. 2d 748, 774 [106 P.2d 84]; *People* v. *Buono, supra,* 191 Cal. App.2d 203; see also *People* v. *Anderson* (1949) 90 Cal.App. 2d 326, 330-331 [202 P.2d 1044], referring to a number of cases in which the conspiracy was planned in one county and the principal overt act occurred in another county, in all of which, as well as in *Anderson,* it was held that venue lay in either county.

 Defendant Siegel also contends that the trial court erred in failing to instruct the jury on its own motion that an overt act must have been committed in Santa Clara County in order for the case to be properly tried in that county. It is not error for the court to fail to give such an instruction when not requested to do so by the defendant. (*People* v. *Marks* (1887) 72 Cal. 46 [13 P. 149], cited with approval in *People* v. *Mahoney* (1956) 146 Cal.App.2d 485, 497 [304 P.2d 73].)

3. *Consolidation.*

Over defendant Siegel's objection the court ordered the indictment and information consolidated for trial.

Section 954, Penal Code, provides that two or more accusatory pleadings charging two or more different offenses of the same class of offenses may be consolidated for trial by the court. This section authorizes the consolidation for trial of two or more accusatory pleadings in each of which the defendants are charged jointly. (*People* v. *O'Connor* (1927) 81 Cal.App. 506, 511 [254 P. 630].)

 " '. . . a joinder of distinct offenses is permissible if there is a common element of importance in their commission.' " (*People* v. *Kemp* (1961) 55 Cal.2d 458, 475 [11 Cal. Rptr. 361, 359 P.2d 913].) In the offenses at bench there definitely was an element of importance in their commission in that they were a part of a continuous sequence of offenses, all concerned with the sale of, and the offer to sell, narcotics. Defendant's assertion without amplification that the consolidation was prejudicial requires no discussion. "A bald assertion of prejudice is not enough." (*People* v. *Kemp, supra,* p. 477.) Nor is there any merit to the contention that the court by consolidation could not add to

the issue which had already been tried. The reversal of the first charge put the parties back in the same position as if it had not been tried. (Pen. Code, § 1180; see *Odlum* v. *Duffy* (1950) 35 Cal.2d 562, 564 [219 P.2d 785].)

4. *Lack of Speedy Trial.*

Defendant Siegel contends that he was denied the right of a speedy trial for the reason that the offenses charged in the indictment were committed April 4, 1957, and the indictment was not found until February 8, 1960.[4] It is interesting to note that this defendant made identically the same contention on his appeal from conviction of violation of section 664, Penal Code (attempted escape). (*People* v. *Siegel* (1961) 198 Cal.App.2d 676 [18 Cal.Rptr. 268].) We there held (p. 679): ''The contention that the constitutional section is violated by failure to file an accusation speedily after the commission of a crime is flatly answered to the contrary in *People* v. *Aguirre* (1960) 181 Cal.App.2d 577, 579 [5 Cal. Rptr. 477], and in *People* v. *Ragsdale* (1960) 177 Cal.App.2d 676, 678 [2 Cal.Rptr. 640]. In *Aguirre* we stated, 'There is no requirement that a defendant be indicted or arrested at any particular time between the commission of a crime and the expiration of the time allowed by the statute of limitations as to that particular crime.' ''

5. *Cross-examination of Witness Mantler.*

Defendants informed the court that they desired on cross-examination of Mantler to bring out that shortly after their arrest he was suspended from the State Bureau of Narcotics for two weeks because he had concealed or destroyed evidence that would have been used against an old friend. The court refused to permit such examination unless the subject matter could be connected with this case. Counsel for Siegel asked Mantler if at the first trial he had made any false statements. He said ''No.'' The district attorney objected but the court allowed the answer to stand. He was then asked if at that trial he had been asked if he had been an officer of the bureau continuously since 1947. The court sustained an objection to the question. Defendants contend that the question was proper for three reasons: (1) to show that Mantler had made inconsistent statements at the first trial. It is axiomatic that to be admissible the inconsistent state-

[4] No contention is made that he was not speedily tried after indictment found. The trial commenced within 21 days thereafter.

ments must be either made at the present trial or be statements made at the prior trial which are inconsistent with ones made at the present trial. Defendants do not contend that such was the situation here. Mantler at this trial was not asked as to the length of his service with the bureau. The alleged inconsistency occurred at the first trial only. This was an attempt to impeach the witness by evidence of a particular wrongful act. This is not proper. (See *Sharon* v. *Sharon* (1889) 79 Cal. 633, 673 [22 P. 26, 131].) (2) It is contended that the evidence of the suspension would affect Mantler's status as a narcotics expert. However, Mantler did not qualify, nor did he testify, as an expert. (3) It is contended that the evidence would show Mantler's bias and motives in testifying against defendants. It is clear that the evidence could not have had any such effect. Its only purpose obviously was to degrade Mantler in the eyes of the jury. See *People* v. *Vanderburg* (1960) 184 Cal.App.2d 33 [7 Cal.Rptr. 287], quoting from *People* v. *Harlan*, 133 Cal. 16 [65 P. 9] : " '. . . Questions, on cross-examination, tending to show the general immorality of the witness, or specific acts of immorality, should never be allowed in any case for the mere purpose of discrediting or impeaching the witness. [Citations.] Nor can the immoral character of a witness, or specific acts of immorality, be shown by independent evidence for the purpose of impeaching a witness. . . .' " (P. 40.) Although usually no offer of proof is necessary on cross-examination (see *People* v. *Jones* (1911) 160 Cal. 358 [117 P. 176], where, as here, it is obvious that the evidence sought is on its face irrelevant and immaterial and highly prejudicial to the witness, it is incumbent upon the cross-examiner to disclose to the court some reason for its admissibility. This defendants did not do at the trial nor have they done so now. The trial court properly ruled out the evidence.

In spite of the court's warning to Siegel's counsel that it would not permit him to bring out the fact that Mantler had at one time been suspended from the Narcotics Bureau, counsel tried in devious ways to get the matter before the jury. (The same matter had been ruled inadmissible at the first trial.) Counsel had not shown any relevancy of it in this case. On one occasion the court warned counsel not to ''overstep yourself.'' On another the court said that it knew what counsel was trying to do to get ''everything before the Court except what you should get before'' it. Siegel's counsel sought to withdraw from the case, claiming the court's remarks made

him ineffective to properly represent defendant, but the court would not permit it. While perhaps the court should have been more restrained, even though counsel's actions somewhat justified the court's remarks, defendant's rights were not prejudiced. There was no denial of effective aid of counsel. Had the remarks not been made, the jury would have acted no differently than it did.

6. *Informer.*

 As hereinbefore stated, the prosecution did not give defendants any information concerning the informer Tomlinson other than his name, until compelled to do so by our reversal of the judgment in the first trial. Defendants contend that this delay denied them a fair trial. Before the second trial a subpoena obtained by defendant Diaz was served upon Tomlinson. He appeared on the first day of the trial and on order of the court, again on the following Friday. Both the prosecution and the defendants declined to call him as a witness on the ground that he was apparently mentally incompetent. Defendants contend that had they been told at the first trial where Tomlinson could have been located they could have then interviewed him to determine whether he would be a favorable witness and if so they could have had the benefit of his testimony. Under the circumstances of this case, there was no prejudice to defendants by the delay. While at the first trial neither of the defendants testified, and thus there was no record of knowledge of Tomlinson by either defendant, at this trial defendant Siegel testified that he had known Tomlinson for about a month prior to April 4 (the day of the commission of the offenses), had played cards with him occasionally, saw him frequently, and on April 3, Siegel tried to borrow money from Tomlinson, and Tomlinson then suggested that they get together and do ''block-hustling,'' (a ''con game'' by which a cheap watch was sold to a ''sucker'' at a high price). Tomlinson gave him $1.50. The next morning they had breakfast together and further discussed their project. Either the next day or the one thereafter Siegel saw Tomlinson who told him the police had picked him up on a ''felony beef'' but had made him a proposition of getting somebody who was selling narcotics. He saw Tomlinson again the day after this conversation. Thus it now appears that defendant Siegel when at the first trial he was given the name of Tomlinson, knew him, and probably knew his whereabouts or at least how to find him.

Lieutenant McKenzie testified that he had talked to Tomlinson shortly before the second trial, and that while in his opinion Tomlinson was mentally incompetent, nevertheless he spoke with clarity at all times, and did not ramble in his conversation; he remembered the facts of this case, and was not incoherent. Tomlinson told him that he was using percodan (a narcotic) and methedrine.

What Tomlinson's mental condition was at the time of the first trial does not appear. In view of McKenzie's statements concerning Tomlinson, the defendants, if they really thought that Tomlinson was not present at the transactions between Mantler and defendants as testified to by Mantler, should have placed Tomlinson on the witness stand, and whether or not his mental condition was such that he could not testify would have been determined. See *People* v. *McCaughan* (1957) 49 Cal.2d 409, 419-421 [317 P.2d 974], giving the test to be applied in determining whether a mentally ill person is competent to testify. It there holds that there is no absolute disqualification as a witness even of an insane person committed to a state hospital. There is nothing in the record to show (1) that Tomlinson at any time would have testified favorably for defendants; (2) that his mental condition at the time of the second trial was different from what it was at the time of the first trial; (3) that defendant Siegel, at least, did not know of Tomlinson's whereabouts at the time of the first trial; and (4) that defendants were prejudiced by being denied at the first trial any information concerning Tomlinson other than his name.

Defendant Siegel seems to urge that the court erred in not instructing "Tomlinson to appear as a material witness" and in not instructing the jury that he was a material witness. Defendant contends that thereby the court did not comply with the directions of the appellate court in its remand of the case. No such directions appear in the decision, and we know of no reason why the trial court should have given such instructions. Tomlinson was present under subpoena, but, as neither party apparently wanted to call him as a witness, there was no duty upon the court to do so.

Likewise there was no duty upon the part of the prosecution to call Tomlinson to the witness stand. On the prior appeal we said (p. 803) that under the circumstances of this case there was no such duty upon the part of the prosecution. Nor were the circumstances in this respect changed at the time

of the second trial. " 'There is no compulsion on the prosecution to call any particular witness ... so long as there is fairly presented to the court the material evidence bearing upon the charge for which the defendant is on trial.' (31 Cal. 2d 92, 98.) This rule applies to the instant case ..." (*People* v. *Wein* (1958) 50 Cal.2d 383, 402 [326 P.2d 457].) There was no error in these respects.

### 7. *Cross-examination of Defendant Siegel.*

 Defendant Siegel took the witness stand and on direct examination related his version of the events on April 4 and up to and including a phone conversation with Mantler on April 12. On cross-examination he was asked concerning his association with defendant Diaz on April 13, and also concerning his acquaintance with Diaz. Defendant Siegel contended that these questions were beyond the scope of his direct examination. The court overruled the objection.

 Section 1323, Penal Code, provides that a defendant who offers himself as a witness may be cross-examined "as to all matters about which he was examined in chief." The cross-examination must be so limited. (*People* v. *McCarthy* (1948) 88 Cal.App.2d 883, 887-888 [200 P.2d 69].) "This does not mean that the cross-examination must be confined to a mere categorical review of the matters, dates or times mentioned in the direct examination. [Citations.] It may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on his direct examination. [Citations.] ... If a defendant takes the stand and makes a general denial of the crime with which he is charged the permissible scope of cross-examination is very wide. [Citations.] Moreover, as stated in *People* v. *Teshara,* 141 Cal. 633, 638 [75 P. 338], 'A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. He can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief, as well as with respect to facts which he expressly states.' [Citations.] Language to the contrary in *People* v. *Arrighini,* 122 Cal. 121, 127 [54 P. 591], must be deemed to have been impliedly overruled by later cases." (*People* v. *Zerillo* (1950) 36 Cal.2d

222, 228-229 [223 P.2d 223] ; see also *People* v. *Weiss* (1958) 50 Cal.2d 535, 560-561 [327 P.2d 527] ; *People* v. *Butterfield* (1960) 177 Cal.App.2d 553, 558-561 [2 Cal.Rptr. 569].)

Defendant Siegel had testified to facts conflicting with those given by Mantler. He denied that Diaz was present on April 4. While he admitted phoning to Mantler on April 10, 11 and 12, he claimed that he was trying to "con" Mantler and did not really intend to participate in a sale of narcotics. Siegel's acquaintance and relationship with Diaz was a material factor for the jury to consider in connection with Siegel's contradiction of Mantler's testimony concerning Diaz' part in the transactions. Likewise inquiry was proper concerning the transactions of the 13th even though Siegel had ended his testimony with events of the 12th. There was no error in this cross-examination.

It should be noted that although the court instructed the witness to answer the questions to which it overruled the objections, defendant refused to do so, and no sanctions were imposed.

Moreover, defendant's only objection to the questions asked was that his answers might incriminate him. However, by taking the stand and denying his participation in the crimes alleged and relating his actions he had waived his privilege against cross-examination. (See *People* v. *Zerillo, supra,* 36 Cal.2d 222, 228-229 ; *People* v. *Weiss, supra,* 50 Cal.2d 535, 560-561; *People* v. *Butterfield, supra,* 177 Cal.App.2d 553, 558-561; *People* v. *Tarantino* (1955) 45 Cal.2d 590, 599 [290 P.2d 505].) Having failed to object upon the ground of not proper cross-examination, such objection may not be raised now. (*People* v. *Beal* (1951) 108 Cal.App.2d 200, 204 [239 P.2d 84].)

### 8. *Diaz' Motion to Dismiss.*

Diaz moved to dismiss the charge of selling heroin, which motion the court denied. It is not clear what Diaz' contention really is. Mantler testified that Tomlinson, Diaz, Siegel and he were in the restaurant where he and Diaz haggled about the price of half an ounce of heroin which Diaz had. After agreeing on $550 as the price, they all returned to the automobile. Diaz told Mantler where to stop the car. On leaving it Diaz told Mantler to drive around the block and then pick him up. This Mantler did. When Diaz returned to the car Diaz handed the heroin to Mantler and then Mantler gave

Diaz $550 in marked money. Diaz now says, ''What happened to the $550 in 'marked money' allegedly paid to defendant Diaz'' and that there is no proof that Tomlinson did not keep the money. In view of Mantler's testimony that he paid the money to Diaz, this contention confuses us completely.

### 9. *Entrapment.*

 Defendant Diaz contends that there is no evidence that Diaz was ever before involved in the sale of narcotics, or that he had a preexistent intent to sell narcotics to Mantler and that he was entrapped into doing so. Hence, says Diaz, the court should not have left the question of entrapment to the jury. There is no merit to this contention. It is true that Tomlinson brought Diaz and Mantler together. However, the evidence shows that Diaz had the heroin in quantity, knew the various prices of the stuff, and desired to sell it. Mantler's testimony (and for the defense of entrapment to be established as a matter of law it must be shown by relying entirely on the evidence of the prosecution (*People* v. *Benford* (1959) 53 Cal.2d 1, 12 [345 P.2d 928])), shows no more pressure or persuasion than ordinarily occurs between a willing buyer and a willing seller. (See *People* v. *Richardson* (1957) 152 Cal.App.2d 310, 318 [313 P.2d 651].) All the officers did was to furnish an opportunity to make the sale.

Moreover, it must be remembered that Diaz did not testify and that his defense was that as he was in Los Angeles at the time of the sale he could not have been present at the sale. As said in *People* v. *Johnson* (1950) 99 Cal.App.2d 559, 562 [222 P.2d 58], defendant's ''position is similar to that of the appellant in the case of *People* v. *Lee,* 9 Cal.App.2d 99 [48 P.2d 1003], where Lee denied that any sale was made or that he had any narcotics in his possession, but still argued entrapment. At pages 109-110 the court there said: 'It is our understanding that the defense of entrapment is a positive defense imposing upon an accused the burden of showing that he was induced to commit the act for which he is being prosecuted. *The invocation of the defense necessarily assumes that the act charged as a public offense was committed.'* (Emphasis added.) ''

Diaz also contends that the court in instructing on the defense of entrapment failed to point out that such defense was applicable to the charge of conspiracy. A reading of the instructions as a whole shows that they applied to all the

crimes charged. ▮▮▮ If defendant desired a more specific instruction he should have offered one.

▮▮▮ As the evidence clearly showed that the conspiracy was planned in Santa Clara County although one of the overt acts, that of transporting the heroin, occurred in San Mateo County, there was no need for the court to instruct the jury on jurisdiction of the conspiracy charge.

10. *Conduct of District Attorney.*

▮▮▮ Defendant Diaz contends that certain statements of the district attorney constituted prejudicial misconduct. We have examined them all and find no prejudice. Most of them were fair comment on the evidence. One or two of them, had they been objected to, would have justified an instruction from the court to the jury to disregard them. With one exception none of them were objected to. Objections of this type should be rejected when raised for the first time on appeal. (*People* v. *Wein, supra,* 50 Cal.2d 383, 396.)

The district attorney stated to the jury that if it did not think there was an offer to sell heroin, "turn them loose, give them their stuff back." Defense counsel then asked the district attorney if he meant to imply that the narcotics could be returned. The district attorney then said, "No, we'd hang on to it. It's a figure of speech." Counsel then asked that the remark be stricken. The court ordered it stricken and the jury were instructed to pay no attention to it. Applicable here to all the district attorney's comments is the following from *People* v. *Wein, supra,* 50 Cal.2d at page 396: ". . . this is not a case where any possible harmful effect of the comments could not have been obviated by a timely admonition to the jury [citation] or where the evidence was so closely balanced, presenting grave doubt as to defendant's guilt, that the prosecutor's argument materially affected the outcome."

11. *Multiple Punishment.*

Defendants contend that they have been subjected to multiple punishment for the same crime. Defendants were convicted and sentenced (the sentences to run concurrently) for (1) sale of heroin on April 4, in violation of section 11500, Health and Safety Code; (2) offer to sell heroin on April 4, in violation of the same section; and (3) conspiracy to sell heroin (the indictment as to this offense gives the overt act as transporting heroin on April 13) in violation of section 182, Penal Code.

■ Under (1) the sale of heroin to Mantler for $550 was completed and constituted one transaction. Thereafter on the same day defendants offered to sell more heroin to be delivered the following Wednesday. This constituted a separate offense. The evidence impels the reasonable inference that defendants had agreed together to offer to sell Mantler such quantity of heroin as he might take. This constituted the third offense, one overt act of which took place when on April 13 the defendants transported the heroin to the agreed meeting place. The crime of conspiracy to offer to sell heroin is one separate and apart from the crime of offering to sell. It could be completed without actually making such offer. Thus the agreement between Diaz and Siegel to make such offer, which agreement is reasonably inferable from the acts of defendants, plus the overt act of transporting heroin for the purpose of making the offer, constituted the crime of conspiracy. ■ The mere fact that two acts are closely connected in time and a part of the same criminal venture, which might be said of the offer to sell and the conspiracy to offer to sell, is not decisive when the act giving rise to each crime is separate and distinct and not incidental to or the means by which the other crime is committed. (See *People* v. *Slobodion* (1948) 31 Cal.2d 555, 563 [191 P.2d 1].) The crime of offering to sell heroin was completed on April 4. The conspiracy to offer to sell continued on through the various telephone conversations until and including April 13.

■ The crime of conspiracy is separate and distinct from the commission of the crime forming the object of the conspiracy. (*People* v. *Severino* (1953) 122 Cal.App.2d 172, 184 [264 P.2d 656].) ■ Thus the offer to sell was a crime separate and apart from the conspiracy formed for the purpose of offering to sell even though the act of offering to sell occurred and the conspiracy to offer to sell were formed on the same day. ■ "When two separate offenses arise out of the same transaction and when each offense is stated as a separate count and when the two offenses differ in their elements, and one is not included in the other, an accused may be convicted of the two offenses. As was said in the case of *People* v. *Chait*, 69 Cal.App.2d 503, 518 [159 P.2d 445], quoting from *People* v. *Hoyt*, 20 Cal.2d 306, 317 [125 P.2d 29], 'The test is the identity of the offenses as distinguished from the identity of the transactions from which they arise.' " (*People* v. *Severino, supra,* at p. 184; see also *Neal* v. *State of*

*California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839].)

There was no double punishment in this case.

The judgments are affirmed.

Sullivan, J., and Conley, J.,* concurred.

The petition of appellant Siegel for a rehearing was denied August 31, 1962.

*Assigned by Chairman of Judicial Council.